Securities Realization Company, Appellant, v. Peabody and Company et al., Appellees.

Gen. No. 40,325.

Opinion filed April 26, 1939.

FREDERICK A. BROWN, of Chicago, for appellant; DANIEL F. KEMP, of counsel.

D'ANCONA, PFLAUM & KOHLSAAT, of Chicago, for certain appellee.

CHAPMAN & CUTLER, of Chicago, for certain other appellees; RALPH F. HUCK, of Chicago, of counsel.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, of Chicago, for certain other appellees; MAURICE BERKSON, BEN ROTHBAUM and ISAAC E. FERGUSON, all of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Plaintiff prosecutes this appeal from a decree of the superior court of Cook county, dismissing the complaint, as amended, for want of equity.

Peabody Houghteling & Company and its predecessors had been engaged in the mortgage and securities business for 65 years. In 1919 a corporation was formed, and the partners who had theretofore conducted the business were given $500,000 of preferred stock for the good-will of the partnership. On April 3, 1929, the corporation entered into an agreement with Augustus S. Peabody, A. J. Hennings, F. A. Thulin, William C. Gibson, Edgar A. Peck and John J. Weishel. The preamble recited that the corporation desired to sell its good-will, furniture, fixtures, leasehold, records and the entire inventory of live marketable securities and to retire from active investment banking business, and that the other parties referred to as "the syndicate," were interested in organizing a corporation under the laws of Delaware, to be known as Peabody, Hennings & Co., which was to have a paid-in cash capital of $1,000,000, and that the parties comprising the syndicate desired to acquire for the syndicate, or the corporation to be formed, the "good will, furniture, fixtures, leasehold, records and the entire inventory of live marketable securities of the company." In the first article of the contract the corporation agreed to sell to the syndicate its good-will, furniture, fixtures, records and the leasehold of the second floor space of the Otis Building for $500,000, payable in cash in equal monthly instalments over a period of five years without interest. The corporation agreed to sell to the syndicate certain assets listed in schedules, for which assets the syndicate agreed to pay by assuming certain listed liabilities, and pay the difference in cash. The syndicate also agreed to pay an additional sum of $40,000. The corporation agreed not to engage actively in the investment banking busi-

ness for a period of 15 years. The seventh clause of the contract provided that:

"In the event of a default by the parties of the second part in the payments herein specified, or in the performance of the other covenants herein contained to be performed, the parties of the second part shall, after thirty days' written notice from the Company, redeliver the property conveyed to them under the terms of Article First hereof. It is further mutually agreed and understood that in such event of default, and a continuance thereof after the giving of thirty days' written notice by the Company, said Company shall be relieved of its obligation contained in Article Sixth and immediately thereupon may engage actively in the investment banking business." On the day the contract was executed, it was assigned by Peabody, Hennings, Thulin, Gibson, Peck and Weishel to Peabody, Hennings & Co., a Delaware corporation. On the same day and in the same instrument, Peabody, Houghteling & Company consented to the assignment. The business of Peabody, Houghteling & Company was turned over by the syndicate to the new corporation known as Peabody, Hennings & Co., which was organized on March 20, 1929, under the law of Delaware. On August 9, 1929, the name of the new corporation was changed to Peabody & Company. On November 18, 1933, in the superior court of Cook county, a judgment in the sum of $466,052.85 and costs was entered in favor of Peabody, Houghteling & Company against Peabody & Company, on which execution was issued. The judgment was grounded on the failure of Peabody & Company to make the payments called for by the contract of April 3, 1929. The complaint in the case at bar was filed by Peabody, Houghteling & Co., on January 8, 1934. On May 19, 1936, on petition of the Securities Realization Company, a corporation, an order was entered permitting that corporation, which is the present

plaintiff, to be substituted as plaintiff in place of Peabody, Houghteling & Co. The order permitting the substitution was based on a petition filed by the present plaintiff, setting out the assignment of the judgment and the contract of April 3, 1929 from Peabody, Houghteling & Co. to it. For brevity, we will refer to Peabody, Houghteling & Co., and the Securities Realization Company as plaintiff. On May 31, 1933, plaintiff served notice on Peabody & Company, reciting that default having been made in the payment specified in the contract of April 3, 1929, plaintiff demanded a redelivery to it of such of the properties conveyed in Article First of said contract to said parties of the second part "as you now hold, that is to say, furniture, fixtures and records of Peabody Houghteling & Co., conveyed to said parties of the second part under the said contract." In the same notice plaintiff stated that if the default continued 30 days thereafter, plaintiff would consider itself relieved of its obligation not to engage actively in the investment banking business for a period of 15 years. On November 20, 1933, in the chancery court of the State of Delaware in an action entitled *Ross G. Byron v. Peabody & Company,* a corporation, the court found that said corporation was insolvent; that the corporation had filed an answer consenting to the appointment of a receiver; that the answer was filed by authority of the board of directors of the corporation; and the chancellor ordered that Harold B. Howard of Wilmington, Delaware, be appointed receiver for Peabody & Company, and that he file a bond in the sum of $5,000. The receiver qualified.

The original complaint in the instant case asked for the appointment of a receiver and that defendants be required to return to plaintiff the items mentioned in Article First, including the good-will. After the case was presented before the master, plaintiff, upon

leave granted, filed an amendment known as paragraph 19, which reads as follows:

"This action is brought on behalf of plaintiff and all other creditors of Peabody & Company similarly situated." and by amending the prayer of said complaint to read as follows:

"Plaintiff asks: 1. That some suitable person be appointed receiver to take possession of all the property in this State of Peabody & Company, and all its books, records, papers and copies thereof, and all moneys recovered from any of the defendants herein.

"2. That the defendants, W. C. Gibson & Company, First Management Corporation, T. F. Murchison, Q. P. Alford, E. A. Peck, Ross G. Byron and H. A. Bray, be required to account for and turn over to the receiver appointed by this Court: (a) All cash and property received by them or any of them from the customers or clients of Peabody & Company or Peabody, Houghteling & Company; (b) All moneys received by them or any of them in reorganizing or attempting to reorganize any properties or corporations under bond issues underwritten by Peabody, Houghteling & Company or Peabody & Company, or otherwise; (c) All profits or other income received by them or from the use or operation of any property and any business formerly belonging to or operated by Peabody & Company or Peabody, Houghteling & Company; (d) All furniture and physical property coming into the possession of them or any of them and formerly belonging to Peabody, Houghteling & Company or Peabody & Company; and that the moneys and proceeds thus recovered from said defendants and paid to said receiver be distributed as directed by this Court.

"3. That this Court shall fix a sum or sums representing the value of the business and good will theretofore belonging to Peabody & Company and taken

over by W. C. Gibson & Company and defendant First Management Corporation, or any other defendant in this action, and that said defendants may be ordered to pay such sums, respectively, as may be found, to the receiver appointed by this Court, and the same distributed as directed by this Court.

"4. That plaintiff may have such other and further or different relief as equity shall require and to this Court may seem meet." On May 31, 1933, at a meeting of the board of directors of Peabody & Company, the president, T. F. Murchison, stated that "there would be no opportunity to engage in the underwriting business for a period of at least six months"; that it was highly advisable to reduce expenses to a minimum and conserve the assets in the hope that it would be prepared to engage in the underwriting business, when business was generally resumed; that a number of the employees of the corporation had associated themselves with Mr. Gibson in organizing W. C. Gibson & Company for the purpose of conducting a trading business which was only identical to the business of Peabody & Company; that Mr. Gibson and the employees desired to do what they could do to conserve Peabody & Company; that he recommended that the offer of Mr. Gibson and his associates be accepted and he presented a draft of agreement prepared, which if acceptable to W. C. Gibson & Company would bring about a great reduction in expenses, and that if the board were in agreement the only business which Peabody & Company would discontinue engaging in would be that of trading its securities. Mr. Murchison then read the draft of the agreement and the board of directors voted to adopt it. Hence, Peabody & Company suspended active operations as of May 31, 1933. Plaintiff maintains that O. P. Alford, individually and through the First Management Corporation, which he controlled, and W. C. Gibson, individually, and W.

C. Gibson & Company, which he controlled, and other individuals, violated their duties as officers and directors in taking over the business and good-will of Peabody & Company; that their actions constituted a fraud on the creditors; that their actions were for their own profit and in violation of the contract of April 3, 1929; that the First Management Corporation and W. C. Gibson & Company should account for the value of the property taken over by them, including the good-will and profits made by them on the business, and that the individual directors of Peabody & Company who took over the reorganization of property on which bonds had been issued, should account for the moneys received by them.

Plaintiff and defendants objected to the master's report, and the objections were permitted to stand as exceptions. The chancellor overruled the exceptions of plaintiff and sustained the exceptions of defendants and entered a decree dismissing the complaint (as amended and supplemented), for want of equity. Plaintiff urges that the officers and directors of Peabody & Company were acting in a fiduciary capacity, and that they took advantage of their relationship to their own gain and to the detriment of the corporation. Defendants respond by declaring that they acted in good faith. Therefore, it has been necessary to carefully examine the record. We agree with defendants that in order to understand the situation, it was necessary to present evidence showing the difficulties that Peabody, Houghteling & Co. faced at the time the agreement of April 3, 1929, was made. The finding that the sale of plaintiff's business to the syndicate was occasioned by the financial difficulties facing plaintiff is supported by the evidence. A few months after the sale occurred the stock market collapsed, which was the start of the depression. The effect on the affairs of the new corporation is shown by the fact that

whereas bonds and stock sales of plaintiff amounted to $37,781,717.50 in 1928, defendant corporation sold $12,254,196.33 in stocks and bonds in 1930; $5,875,000 in 1931, $1,598,000 in 1932, and suffered a net loss of over $145,000 in 1930, and corresponding net losses in 1931 and 1932. In the spring of 1933, the new company became involved in certain transactions reflecting upon its integrity, and particularly in connection with the attempted reorganization of Pettibone Mulliken Company, and the consequent newspaper notoriety, and the suit filed against Peabody & Company and others had an adverse effect on the affairs of the new corporation.

Plaintiff contends that when Peabody & Company suspended operations on May 31, 1933, the ''real estate department taken over by O. P. Alford was always profitable. In 1930 after deducting from the gross profits the commissions, salaries of officers, general payroll and miscellaneous, etc., amounting to $73,606.-43, it left a net profit of $31,822.02. For 1931 the gross profit was $28,799.78, and after deducting salaries and miscellaneous expenses of $23,909.87, it left a net profit of $4,809.91. The net profit for 1932, after deducting $18,173.80 expenses, was $16,174.35. All this Alford and his First Management Corporation took over without paying a dollar for it. Of course, Alford could not have gotten this business if he had not been a director of Peabody & Company.'' In 1929 Peabody & Company paid one quarterly dividend of 1¾ per cent. on its preferred stock. .Thereafter, nothing was paid on account of dividends or principal. We find that there is no justification for the charge of bad management. The gross sales by the old company for the year 1928 amounted to $37,781,717.50. The gross sales for the new company in 1930 amounted to $15,776,641.33; in 1931 $5,875,934.85 and in 1932, $1,598,604.76. In 1928 the old company had a net profit

of $51,646.60. In 1930 the new company had a net loss of $145,656.15; in 1931 a net loss of $121,497.37, and in 1932 a net loss of $5,488.76. These were the dark years of the depression, and the mortgage, bond and securities business suffered even more than most other lines. Because of the diminishing business, it was decided to reduce salaries and expenses. The salary of Ross Byron, vice president, was reduced from $1,000 per month to $150 per month; that of Joseph M. King, comptroller (and later secretary) from $416 per month to $250; that of H. A. Bray, vice president in charge of the statistical department, from $6,000 per year to $3,600 per year, and that of William C. Gibson, vice president and sales manager from $1,000 per month to $450 per month. The total expenses of the old company in 1928 were $1,013,874.10, and the expenses of the new company in 1930 were $833,833.57. In 1931 they were $423,401.70 and in 1932, $119,686.92. The officers' salaries of the old company in 1928 were $179,774.72, and of the new company in 1930, $88,484.88. In 1931 they were $43,406.57 and in 1932, $28,800. Other expenses were curtailed accordingly. The sales of mortgages from January 1, 1933, to May 1, 1933, totalled $64,000. As conditions became worse, defendants endeavored to bring new capital into the company, but their endeavors met with failure. The findings of the master that the new company was handicapped from the start, that by the middle of 1931 "there was much trouble and bondholders created disturbances about defaulted issues," that the management did its best to reduce expenses, that the officers and directors attempted to carry on until they could not do so without new capital, that plaintiff refused to co-operate in obtaining new capital, that new capital could not be obtained without the co-operation of plaintiff, and that finally the "point was reached in the early part of 1933 when it became apparent that

Peabody & Company could not go on," were justified by the evidence. His findings that there was no evidence of any conspiracy, bad faith or misconduct, and that there was nothing disloyal in the acts of any of the defendants, are also supported by the record. An examination of the statements reveals that the new corporation sought to reduce the trust fund items, the responsibility for which was taken over by the new company. W. C. Gibson was a director, vice president and sales manager of the securities department of Peabody & Company. On June 1, 1933, he organized W. C. Gibson & Co., with a capital of $5,000, borrowing the money from Ross G. Byron, vice president of Peabody & Company. All of the stockholders were connected with Peabody & Company. Plaintiff argues that the suspension of business and the formation of W. C. Gibson & Company were disloyal acts, conceived by the desire of the purchasers for personal profit and to the detriment of Peabody & Company and its creditors. Plaintiff states that Gibson & Company "took over the accounts, lists of customers, etc., together with eleven employees of Peabody & Company, and is still conducting that business." The motive that actuated the parties concerned in suspending the business of Peabody & Company may be gleaned from the minutes of the meeting of the board of directors of Peabody & Company, held on May 31, 1933, as follows:

"Mr. Murchison stated that in his opinion there would be no opportunity to engage in the underwriting business. . . . It was therefore highly advisable for the corporation to reduce its expenses to a minimum and to conserve its assets in the hope that it would be prepared to engage in the underwriting business when such businesses would generally resume. He also stated that a number of the employees of the corporation had associated themselves with Mr. Gibson in organizing a corporation under the name of

W. C. Gibson & Co. for the purpose of conducting a trading business. . . . That Mr. Gibson and the other employees retained friendly and loyal feelings to Peabody & Company and desired to do what they could to serve. . . . In anticipation . . . he, Mr. Murchison, had a draft of agreement prepared which, if acceptable to W. C. Gibson & Co., would bring about a great reduction in expenses for Peabody & Company and would enable Peabody & Company to carry on such activities as it now ought to indulge in without the hazard and responsibility of maintaining a large office and a large personnel. . . . Thereupon on motion duly made, seconded and carried the following resolution was adopted:

"Whereas, because of adverse economic conditions generally obtaining there are virtually no security offerings to be underwritten or participated in; and

"Whereas, it is the opinion of the Board of Directors of this corporation that no underwritings of securities be undertaken by this corporation during the period of six months next ensuing; that during said period of six months the activities of this corporation be confined to reducing the said indebtedness for which said collateral is held as security . . . and that all expenses of this corporation be reduced during said period of six months, with a view to realizing . . . a sum sufficient, at the end of said six months' period, to enable this corporation to resume the business of underwriting and selling securities . . .; and,

"Whereas, W. C. Gibson & Co. . . . has recently been created . . . and

"Whereas, said persons formerly employed by this corporation have offered to render such services as may be reasonably required of them to enable this corporation to carry out a plan by which this corporation may conserve its resources for a period of six months beginning with June 1, 1933;

"Now, THEREFORE, BE IT RESOLVED:

"Second: That all leases of this corporation be terminated as of June 1, 1933, and that the President and Secretary be and they hereby are authorized to lease for this corporation such space as in their judgment may be necessary, provided the rental for such space be not more than One Hundred Dollars ($100) per month, until otherwise ordered by the Board of Directors of this corporation; . . .

"Sixth: That the President and Secretary be and they hereby are authorized and empowered to enter into an agreement with W. C. Gibson & Co., substantially in words and figures next following, to wit";

At that time, substantially all of the assets of Peabody & Company were pledged with banks, who were insisting on protecting their rights. The contract with Gibson & Company contemplated that for a period of six months the latter would collect and remit all outstanding accounts receivable, answer correspondence and do such other things as Peabody & Company might from time to time direct. Gibson & Company was to be paid $2,500 for this service, such payment to be made only out of collections. In view of the finding, in which we concur, that Peabody & Company could not continue in business at that time, the action of the board of directors was reasonable. There is no evidence of fraud. The record does not establish that Gibson & Company was formed to enter into the contract with Peabody & Company, or for the purpose of possessing the business of Peabody & Company. At that time it became necessary to suspend the business of Peabody & Company. As Gibson and his associates were acting in good faith, they had a right to form their own company in order to carry on the security business. That was the business they understood. The employees and officers of Peabody & Company, faced with the necessity of earning a living, also had a right to be-

come employees of Gibson & Company. So long as they were acting in good faith, Peabody & Company cannot complain, nor did it suffer any loss because the employees went with the new company. Apparently, Gibson & Company carried out its contract with Peabody & Company. Whether Peabody & Company could successfully re-engage in business will never to any degree of certainty be known because before the expiration of the six-months' period, and following the judgment taken by plaintiff, the Delaware receiver was appointed. The petition for the appointment of the Delaware receiver was signed by Ross G. Byron. Necessarily, the dissolution and winding up of the corporation would have to be under the orders of the Delaware court, the corporate charter having been issued by that commonwealth. If there was anything fraudulent in the action of Byron in asking the Delaware court to appoint a receiver and wind up the affairs of the corporation, that court was open to any person who wished to be heard. No one presented any charges before the chancellor of Delaware. Gibson & Company surrendered to the Delaware receiver all of the property that it had of Peabody & Company. While Gibson & Company was formed 12 days before Peabody & Company suspended operations, it was apparent for some period that it would be necessary for some action to be taken. Gibson & Company did not give employment to all of the old employees of Peabody & Company; most of them went with other investment houses. The record sustains the master's findings that Gibson & Company did not take over the business of Peabody & Company. Gibson & Company entered into a new lease, removed the name of ''Peabody & Company'' from the door, obtained a new and different telephone line and number, and new letterheads were procured which did not contain any reference to the old firm of Peabody & Company. Gibson

was not a large stockholder of plaintiff. He was a director for the period from December, 1932, until May, 1933. Prior to that time, he was connected with the sales end of the business. During the period he was director he was one of fifteen directors. After Peabody & Company suspended business he had nothing to do with its affairs. There were many conferences and negotiations between plaintiff and Peabody & Company relative to the payment of the unpaid portion of the purchase price of $500,000. After plaintiff took judgment, it became apparent that Peabody & Company could not resume business. The Delaware receiver came to Chicago and took possession of the property of Peabody & Company, including documents, books and records, under the direction of the Delaware chancellor; an appraisal was made and the receiver offered the furniture, fixtures and equipment for sale at not less than the appraised value. At the sale Gibson & Company purchased office equipment, filing cabinets, smoking stands, and one item described as "Lot. No. 291, one 5 and 6 drawer steel card cabinet with contents." Voluminous testimony was offered as to whether Gibson & Company unlawfully took possession of cards and other records of Peabody & Company. On motion of plaintiff, the court appointed J. Howard Branch as receiver. Branch, the receiver appointed by the chancellor, has in his possession 18 bond indexes and card indexes of customers, and books of account. An inventory filed by him lists over 260 various files pertaining to customers. Plaintiff cannot attack the validity of the transaction whereby Gibson & Company purchased from the Delaware receiver; in fact, plaintiff has not attacked the validity of the Delaware proceedings. It will also be noted that plaintiff filed a claim in the Delaware dissolution proceedings and received a dividend on its claim in the sum of $15,500. At the time of the sale, Gibson & Company

was not in any way connected with Peabody & Company, nor was the sale conducted by Peabody & Company. The sale was conducted by the receiver and there is no charge that the purchase price was not reasonable. We are of the opinion that the purchase is not subject to attack by plaintiff. In addition to the items purchased from the Delaware receiver, the defendants have possession of only such data with respect to sales and customers as accrued to them as their own property while employed by Peabody & Company and during the period of the contract between Gibson & Company and Peabody & Company. It was the custom with Peabody & Company for the salesmen to make up their own records. New salesmen who were hired were expected to bring lists of prospective customers with them. It is plain that the lists in use were not confidential ones. Gibson & Company had lists made up of a compilation of the lists of salesmen that went with Gibson & Company. These lists were not confidential information. Peabody & Company had no property right therein.

Plaintiff asserts that the defendants unlawfully seized and took over the good-will of Peabody & Company. Defendants say they did not take over such "good will," and secondly that in fact, there was no good-will to take over. There is no doubt that in April, 1929, the members of the syndicate valued the good-will of plaintiff very highly. Good-will value is based upon earning potentiality in excess of normal return on tangible assets. It means the existence of intangible values in the business, such as a trade name ·of good repute, location, or uniqueness of product. We are sensible of the fact that a corporation may possess "good will" even when for a period of time it operates at a loss. However, it is apparent from the recitation as to the situation that confronted plaintiff in 1933, that it did not possess any "good will." If the name

Peabody & Company carried "good will" with it at that time, it is strange that neither the Delaware nor the Illinois receiver made any attempt to sell the same.

One of the conditions imposed by the Penn Mutual Life Insurance Company when business was commenced with Alford was that the name Peabody Management Company be changed so as to eliminate the word Peabody. To that request, Alford assented, and accordingly the name was changed to First Management Corporation. From a consideration of the entire record, we find that Gibson did not violate any duty that he owed to Peabody & Company, and that he had a right to organize the corporation of W. C. Gibson & Co., and to conduct it in the manner disclosed by the record.

In considering the charges against O. P. Alford and the First Management Corporation, it will be unnecessary to repeat what has been said previously. Penn Mutual Life Insurance Company was a good customer of plaintiff, and after April 3, 1929, of Peabody & Company. Plaintiff and Peabody & Company placed mortgages on real estate and sold the mortgages to the insurance company. The commission was paid by the mortgagor. There was no agency contract. As a matter of practice, however, it was expected that plaintiff and Peabody & Company would continue to service the mortgages until maturity. The mortgages generally ran for terms of 5 or 10 years. For this service no compensation was paid by the insurance company. No reserve was set up out of the commissions received to cover the future cost of servicing the mortgages. The volume of mortgages sold by Peabody & Company to Penn Mutual shrank from $3,522,000 in 1930 to $1,239,000 in 1931, $502,000 in 1932 and only $64,000 during the first five months of 1933. Nevertheless, the servicing of the mortgages extended to the large volume sold to the insurance company during the pre-

vious years. Notices were sent to mortgagors of payments due, tax payments checked, properties periodically inspected, interest and principal maturities collected and remitted to the insurance company. The cost of this work was substantial. During the depression collections became increasingly difficult. While earnings of Peabody & Company on current business approached the vanishing point, there was no proportionate decrease in the cost of servicing the past business. By the end of 1932 it became apparent that Peabody & Company would have to abandon the Penn Mutual business unless some subvention could be obtained from the insurance company. Alford was requested to go to Philadelphia to confer with the officers of the Penn Mutual. For many years this insurance on the Chicago properties covered by mortgages held by Penn Mutual, had been placed through Alford & Company, general agents for a large number of insurance companies. Hence, he was acquainted with the officers of the insurance company. He tried to obtain an allowance of $1,000 for expenses of the Detroit office of Peabody & Company, but was allowed $150 or $200 per month. Later the Detroit office was taken over by the insurance company, and the office of Peabody & Company in Detroit was closed in February, 1933. Alford was requested to go to Philadelphia to request an allowance for the Chicago office of $1,000 a month. The representatives of the insurance company told him that they were considering the advisability of taking over the business in Chicago, the same as they had in Detroit, and that they had received unsatisfactory reports concerning the financial standing of Peabody & Company. Alford replied that although the finances of Peabody & Company were not in the best of shape, provision had been made to protect the interests of Penn by segregation of funds. Finally, he obtained a commitment of the insurance company

to allow $500 a month on the expenses of the Chicago office as a month to month arrangement. Accordingly, during the last three or four months that Peabody & Company carried on active business operations, it received $500 per month from Penn for servicing the Chicago mortgages held by the insurance company. This allowance was less than the cost of the work to Peabody & Company. In September, 1932, an officer of plaintiff went to Philadelphia and solicited the return to plaintiff of the Penn Mutual loan agency in Chicago. Neither plaintiff nor Peabody & Company ever did any real estate agency or building management business. There was a bookkeeping segregation under the heading of "real estate department," which represented income and expenses of the mortgage business as distinguished from the underwriting and sale of stocks and bonds. The income thus segregated included commission on insurance, and certain "real estate management" fees, which in fact were received for supervising the operations of certain properties on which bond issues had been defaulted. Peabody & Company did not actually manage properties. In 1932 there were mortgage sales of $502,000 and a gross profit of $15,692.50, and commission on insurance and loan renewals of $16,141.31. The statement shows a net profit in this department for the Chicago office of $16,174.35. In the 1930 and 1931 statements there was a charge for overhead of $1,000 per month. No such charge appears in the 1933 statement. If such charge were included, the net profit of the Chicago office "real estate department" for the year 1932 would appear at $4,174.35. The comptroller, Joseph M. King, explains that the omission of the overhead charge against the real estate department in the 1932 statement was immaterial, since the departmental figures were only set up as a matter of convenience and were finally merged in the general profit and loss statement, which reflected

all income and all the expenses of the entire business. The profits of the real estate department primarily depended upon income from the sale of mortgages. The mortgages sold from January 1, 1933, to May 1, 1933, totaled $64,000. The gross profits on sales of this amount of mortgages would be very little. It was therefore necessary to solicit the Penn Mutual for a subvention in order to keep the real estate department in existence. The record shows that by the middle of 1931 there were great numbers of defaults in bonds and notes sold by plaintiff and Peabody & Company. The officers and salesmen of the latter company were overwhelmed with complaints of customers. It was deemed advisable to set up some kind of an organization that might meet the needs of the situation. Murchison and Peabody of Peabody & Company suggested that a corporation with a limited capital be organized to take over the servicing of the defaulted bond issues, the capital of the new company to be put up by the stockholders of Peabody & Company. Pursuant to the discussion, Alford organized the Peabody Management Corporation. Murchison, president of Peabody & Company, agreed to subscribe $500. The other directors did not subscribe. Peabody Management Corporation was organized August 14, 1931. It did not transact business until the early part of 1932, when it began to manage about one-half dozen properties on which Penn Mutual held mortgages. Until Peabody & Company went out of business, Peabody Management Corporation had but a single employee. The money earned went to pay $100 per month for space occupied by Peabody & Company. Peabody & Company did not contribute anything toward the capital, cost of organization or expenses of operation of Peabody Management Corporation. Peabody Management Corporation, during the time Peabody & Company remained in business, limited its activities

solely to real estate management. At the meeting of the board of directors of Peabody & Company on May 31, 1933, Alford inquired what arrangement was going to be made about the Penn Mutual agency. Murchison answered that since Penn Mutual wanted to take the business over, Peabody & Company might as well discontinue it. Around the middle of May, 1933, Alford went to Philadelphia and had a talk with the representatives of Penn Mutual and told them what was happening. They indicated that they already knew what was happening and asked Alford if he would take the "Penn Mutual Agency." Alford replied that he could not take it personally, but that if the agency were given to Peabody Management Corporation, he could set up an organization to take care of the business. One of the representatives responded that if the name of Peabody were eliminated, such an arrangement would be satisfactory. Alford stated that he would have to ask for a continuation of the $500 monthly subvention and the Penn Mutual representatives consented. Alford reported to the officers of Peabody & Company the proposed arrangement, and when it was finally decided that the business of Peabody & Company would be suspended, he took up with some of the employees the matter of working for the management corporation. The name Peabody Management Corporation was then changed to First Management Corporation. On July 18, 1933, Penn Mutual sent a letter to the mortgagors in Chicago that arrangements for servicing loans had been made with the First Management Corporation. When Peabody & Company suspended operations on May 31, 1933, it claimed no control and sought to exercise no control over the disposition of the Penn Mutual agency. It is manifest that the Penn Mutual had sole control over its own business. The insurance company could exercise its discretion to handle the servicing of the loans

direct, or it could make arrangements with any individual or corporation that it chose. There is abundant evidence that the action of Alford & Company in taking over the so-called "Penn Mutual Agency" was in good faith and not violative of any duty that Alford or the other defendants owed to Peabody & Company.

Plaintiff also asserts that Alford & Company unlawfully took over the insurance brokerage business of Peabody & Company. The latter corporation as a subbroker placed through O. P. Alford & Company, as general agent for about 25 insurance companies, insurance on properties on which Peabody & Company made loans. At no time did Peabody & Company undertake a general insurance brokerage business. Under the Illinois license law passed in 1931, it would be necessary for Peabody & Company, in order to continue to receive insurance commissions, to apply for a license as an insurance broker. The act prohibits the payment of brokerage to an unlicensed broker. A license for the year 1932 was issued to Peabody & Company. Upon application for a renewal of the license in 1933, the commissioner of insurance noted that the certificate of authority issued to Peabody & Company to do business in Illinois did not authorize it to carry on an insurance brokerage business in Illinois. Thereupon the commissioner declined to renew the license. On June 14, 1933, the charter of the First Management Corporation was amended so as to authorize it to conduct a general insurance agency and brokerage business, and on June 22, 1933, it obtained specific authorization to conduct an insurance agency business in Illinois. Thereafter, the First Management Corporation, through O. P. Alford & Company, began to receive part of the commission on the insurance placed on properties mortgaged by Penn Mutual. We do not see anything to criticize in this transaction. Alford purchased at the appraised value

of $1,432.75, various items of furniture, sold by the receiver. No testimony was offered attacking the values as fixed by the appraiser. Among the items purchased were filing cabinets which contained some of the papers of Peabody & Company and cards relating to the Penn Mutual loans. The receiver stated that they were of no value to him and that they could go with the cabinets. When J. Howard Branch, the local receiver, was appointed, Alford called his attention to the contents of the filing cabinets. Branch stated that as the Delaware receiver did not consider the records of any value, he did not care to take possession of them. The only records of Peabody & Company of interest to Alford were the cards and correspondence relating to the Penn Mutual loans and the cards showing insurance expirations. It appears that Penn Mutual kept its own record of loans and had as complete a record as Peabody & Company. The insurance cards were duplicate copies of the cards prepared by Alford & Company, the general agents. On these points, we find that the chancellor was justified in finding that there was no breach of duty by defendants and that they acted in good faith.

Plaintiff also contends that Peabody & Company took the initiative in organizing various bondholders' committees, and that the various defendants who were appointed on the committees should account to the creditors of Peabody & Company for the compensation they received for serving on the committees. It is undoubtedly true that it was through the efforts of Peabody & Company that the committees were organized. Each committee acted under a separate deposit agreement, setting forth the duties and powers of the committee and provided for the payment of compensation for the members. Peabody & Company was designated as depositary under some of the agreements. When Peabody & Company made disbursements or

performed clerical services for any committees, charges against the committee were entered on the books of the company and collected when funds became available. Peabody & Company did not assert any claim to fees of the committee members who happened to be officers or employees of the company. It appears that the possibility of earning fees as committee members was held out as an offset to cuts in salaries. In our opinion, the fees of the members of the committees belonged solely to them, and therefore the creditors of defendant corporation cannot claim any part thereof.

A thorough examination of the record in this case convinces us that the chancellor was right in dismissing the complaint for want of equity. There is abundant competent evidence to support the decree. Therefore, the decree should be and it is affirmed.

*Decree affirmed.*

Denis E. Sullivan, P. J., and Hebel, J., concur.