No. 16,986.

Colorado Contractors Association et al. *v.*
Public Utilities Commission.
(262 P. [2d] 266)

Decided October 13, 1953.

334

Mr. Teller Ammons, Mr. Charles D. Bromley, Mr. Robert T. Kingsley, for plaintiffs in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. William T. Secor, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Clark delivered the opinion of the court.

The parties to this litigation are here in the same order as they appeared in the trial court, and we will herein refer to plaintiffs in error as plaintiffs, and to the defendant in error as Commission.

The action was instituted on behalf of the named plaintiffs, all members of the plaintiff association, and others similarly situated, seeking a declaratory judgment to the effect that the Colorado Commercial Carrier Act, and the ton-mile tax provided thereby, is inapplicable to general contractors of the classification of plaintiffs and other members of plaintiff association, or to those similarly situated; to procure an order enjoining the Commission from requiring such contractors to apply for certificates of public convenience and necessity as commercial carriers, the filing of monthly reports, and the payment of ton-mile taxes. To the plaintiffs' second amended complaint defendant filed its motion to dismiss

on the ground that it failed to state a claim upon which the relief sought could be granted. This motion was sustained by the trial court and judgment of dismissal accordingly entered. The question before us is whether the trial court erred by so doing.

Plaintiffs, by reason of the type of work in which they are engaged, are commonly referred to as heavy construction contractors. Generally, they are occupied on very large construction projects, such as highways, irrigation systems, dams, sanitation and sewage disposal plants, construction of public buildings, and operations of similar nature. These structures and improvements are built pursuant to written contracts (usually with some public agency), whereby the contractor agrees to furnish all labor, materials and supplies needed for the completion of the particular job and to perform the contract completely and fully according to specifications provided by the engineers representing the party for whom the work is being done and for a stipulated completed, or turn-key price. While such contracts usually entail many thousands of dollars and are vast in extent of operation, those who perform them are generally referred to as heavy construction contractors more for the reason that it is necessary that they use in such type of construction heavy equipment, including, usually, the use of large trucks for the transportation of the materials required for the construction of such a project.

In the brief filed on behalf of the Commission, some attempt is made to intrude into this case an issue as to how the Act might be construed with respect to what might be termed minor contractors who do not fall within the classification of heavy construction contractors, and who are not members of plaintiff association, nor similarly situated to them. There also is discussion in the brief relative to the statutes imposing a ton-mile tax upon private carriers, it being urged that in certain instances the plaintiffs here might be construed to be private carriers instead of commercial carriers. Neither

of these matters is placed in issue by any pleading in this controversy and will not be discussed in this opinion.

■ The Commercial Carrier Act, with which we are here concerned, is the last of the legislative classifications of carriers by motor vehicles. It originally was enacted as chapter 167 of the 1935 Session Laws, page 880, and, as since amended, now comprises sections 327 to 347, inclusive, chapter 16, '35 C.S.A., some of said sections, with which we are not here concerned, having likewise been amended since 1935. Its general purpose was stated in *Public Utilities Commission v. Manly*, 99 Colo. 153, 60 P. (2d) 913, wherein the following appears on page 159: "The purpose of the registration fees required by the Motor Vehicle Act is not the levying of taxes or the collection of revenue. Such fees are in the nature of a license or toll for the use of the public highways." Our Court further declared in the Manly case that the '35 Act is regulatory in character, not primarily for the raising of revenue, and goes no further than to regulate and license "the use of the highways when used to transport freight in furtherance of any commercial enterprise." (Page 176.)

The first section of the Act (section 327, chapter 16, '35 C.S.A.) entitled "definitions," in subdivision (g), defines "commercial carrier" as follows: "The term 'commercial carrier by motor vehicle' means every corporation or person * * *, other than motor vehicle carriers as defined by section 300 (d) of this chapter, or a private carrier by motor vehicle as defined by section 348 (h) of this chapter, owning, operating, controlling or managing any motor vehicle used in the transportation of property *sold or to be sold* by him or it in the furtherance of any *private commercial enterprise*, or property of which such person or corporation is the owner or lessee, when transported for the purpose of lease or rent, over any public highway of this state between fixed points or over established routes, or otherwise." (Emphasis supplied.) (Section 300 (d) is the Common Carrier Act, and section 348

(h) the private carrier Act.) Section 328 provides that: "No person or corporation shall operate any motor vehicle for the transportation of property *sold or to be sold by him* or it in the *furtherance of any private commercial enterprise,* * * * on or over any public highway in this state, except in accordance with the provisions of this subdivision; provided, however, that nothing in this subdivision shall apply where any person or corporation transports property belonging to him or it *which is not sold or to be sold in the furtherance of any private commercial enterprise* and which is not owned or leased and transported for the purpose of lease or rent." (Emphasis supplied.) Following sections provide for the securing of permits, filing of reports and payment of ton-mile tax. Section 346 of chapter 16 is an exemption provision in which it is stated that farmers and producers of livestock, when transporting their own products, shall not be subject to the provisions of the Act, nor shall it apply "to motor vehicles owned and operated by the United States, the State of Colorado, or any county, city, town or municipal corporation in this state, or by any department of any of them; nor to motor vehicles expressly constructed for towing, wrecking and repairing, and not otherwise used in transporting property; or to hearses or ambulances."

Plaintiffs specify six points of alleged error. The first and last are, generally, that the court erred in granting defendant's motion and in not awarding judgment for plaintiffs in accordance with their complaint. By the second and third specifications plaintiffs allege error on the part of the trial court in holding that contractors, such as plaintiffs, are engaged in private commercial enterprise when constructing public roads under contracts with the State of Colorado, acting through its highway engineer, and in holding that all "public contracts" represent work done in furtherance of "private" commercial enterprise. The fourth specification is that the trial judge erred in holding that the Act applies to

the transportation of materials purchased and owned by the contractor, which are not to be sold or resold, but transported merely for the purpose of being incorporated into a finished construction project being built by the contractor under contract with public or private agencies.

Counsel for defendant deny error in any of the assigned specifications and contend that in the hauling of supplies and materials necessary in the type of construction work done by plaintiffs, they are engaged as commercial carriers by motor vehicle; that when such materials are incorporated in the finished product and settlement made on account thereof, such constitutes a sale and hence the materials are sold or to be sold; that section 346 of chapter 16, '35 C.S.A., granting exemptions, is specific and all inclusive, and since the activities of plaintiffs are not covered thereby, plaintiffs come within the general provisions of the Act; and that, while the contract may be for a public improvement, the contractor nevertheless is engaged in private commercial enterprise.

Other minor points are incorporated and included in the argument, but the above covers the contentions of the respective litigants in a general way, and the foregoing statement thereof is sufficient for our purposes. In fact, as we conceive the issues in controversy, the primary question presented is whether plaintiffs, considering the nature of their work and activities, come within the classification of commercial carrier as defined in the Act.

What is the meaning of "private commercial enterprise?" "Private," of course, means in the interest of the individual, as distinguished from enterprise or business operated by or on behalf of the public, or of any official function performed for public benefit. "Commercial" pertains to commerce. To come within the Act the operator of a motor vehicle must be one conducting an enterprise or business in the field of commerce for

his own benefit. The term "commerce," it is said, is not susceptible of exact or comprehensive definition, and the question of what is commerce is to be approached both affirmatively and negatively. 11 Am. Jur. 7. See, also, 15 C.J.S. 256. It is given different meanings under varying circumstances in the interpretation of certain statutes and doctrines. It has been stretched out of all proportion in some instances and contracted in others. In the main, it should be declared to mean that which the legislature had in mind by its use in the particular statute under consideration.

In considering the statute before us there is nothing to indicate that the legislature used the term "commercial" in any technical sense, but much to justify our conviction that it was intended to be given its ordinary meaning as generally understood in everyday business transactions. The manifest purpose of the Act was to cover that group of motor-vehicle operators who use the public highways of the state in carrying on the business of buying, trafficking in, and transporting by such means any and all types of goods, wares and merchandise from point to point in the state and sold or to be sold by him or it for his or its own private gain in the general field of exchange, trade, business and commerce in the same or similar manner as though such operator was conducting his enterprise at a fixed location. Until the time of the passage of the 1935 Act, the tax was applied only to the movement of commodities and merchandise by motor vehicle over public highways by either common or private contract carriers. Numerous merchandising establishments, rather than patronize common or contract carriers, put their own trucks on the highways for the purpose of transporting or delivering goods and property sold or to be sold by themselves in the usual course of business. There had developed, also, a large volume of business where the carrier, in order to escape payment of the tax under the statutes then in effect, would purchase the commodity and resell it at the other end of the

line, or at some point other than the place of purchase. It was the primary purpose of the 1935 Act to require such an individual to be subjected to similar regulation and to pay the same tax as was required by those carriers operating either as common carriers or under private contract.

In *City of Topeka v. Jones,* 74 Kan. 164, 86 Pac. 162, 163, it was held that "commerce" is "business" within the definition of the latter term as given in Webster's International Dictionary defining it as "financial dealings; buying and selling; traffic in general; mercantile transactions." In a case under the federal Fair Labor Standards Act the following appears: "Until actually used to carry interstate traffic a highway constructed on a site where no highway existed before is not an instrumentality of interstate commerce and consequently work performed in the construction of such highway cannot be regarded as employment 'in commerce' within the meaning of the Act." *Hewlett v. Del Balso Construction Corp.,* 43 N.Y.S. (2d) 650, 652. Again, under the same Act, it was held that employees of a construction contractor charged with the task of sorting materials at a government supply depot, loading same onto trucks and transporting them to points of use on the job, were not engaged in "interstate commerce," on the theory that the materials had been shipped from various places to the supply depot. *Maitrejean v. Metcalfe Construction Co.,* 165 F. (2d) 571, 575. In an action under a statute prohibiting the use of trailers in carrying commodities "in connection with commerce" without a license, where an eight-wheeled over-sized device was being used to transport steam shovels engaged in excavation, it was held that excavation is not commerce; that the transportation of the shovels by means of such vehicle was but incidental to the owner's project of excavation and was not the carrying of commodities "in connection with commerce." *Simpson v. Eastern Massachusetts Street Railway Co.,* 292 Mass. 562, 198 N.E. 920, 922.

The language of the Act itself is clearly in keeping with the foregoing observations since it specifically applies to the transportation of property sold or to be sold. This phrase appears in section 327 (g) of definitions and again in section 328 of chapter 16, '35 C.S.A. To escape the ordinary inference of this language the Attorney General on behalf of the Commission ingeniously contends that the transportation of construction materials by such a contractor is a sale for the reason that the price thereof, as well as the cost of haulage, is figured in the contract price, whether separately stated or not. Since the Act applies only to the transportation of property "sold or to be sold," such a forced construction must have approval in order to bring heavy construction contractors under its provisions. Possibly if such a contractor engaged in constructing highways, bridges, dams, tunnels or similar projects promiscuously with the purpose in mind of selling them, on completion, to the federal government, state, municipality, public agency or private corporation, it might be said that the transportation of materials necessary in the construction thereof, was in furtherance of private commercial enterprise. That, however, is not the manner in which these enormous projects originate. They develop, not in the minds of contractors, but in response to public demand and through the officials of public agencies with whom rests the obligation of determining what they want, where they want it, and providing the specifications for the same. After due notice, bids are received and the contract awarded. The contractor is required to furnish all materials, labor and supplies to produce the stipulated final result. When he purchases these needed materials and supplies, they become his personal property. He has not bought them for resale, but to incorporate them in the completion of a new integrated structure wherein they are completely converted into the project he contracted to construct, and wherein they are useless for any other purpose. The procurement and haulage of re-

quired materials is but incidental to the over-all task of producing the finished product contemplated under the contract. In *Barbe v. Cummins Construction Co.*, 49 Fed. Supp. 168, it is held that interstate commerce ends with the delivery of materials from outside the state to a general contractor. He is in the role of an ultimate consumer and his work is more that of a producer, manufacturer or processor. In *Acme, Inc. v. Besson*, 10 Fed. Supp. 1, 6, it was held that manufacture means transformation; the fashioning of raw materials into a change of form for use. The functions of "commerce" are different. See, also, *United States v. E. C. Knight Co.*, 60 Fed. 934, 936.

The foregoing authorities might be considered weak and insufficient to support our conclusions herein were it not that they are exactly in line with our own pronouncements. In *Bedford v. Colorado Fuel and Iron Corp.*, 102 Colo. 538, 543, 81 P. (2d) 752, we said: "The ultimate consumer of all articles purchased and used by a manufacturer in its manufacturing operations is the manufacturer * * *." In *Craftsman Painters and Decorators, Inc. v. Carpenter*, 111 Colo. 1, 137 P. (2d) 414, it was held that contractors who procure various materials and build them into structures as integral parts thereof under contract are ultimate consumers and not retailers of such materials. These cases, it is true, were with reference to the sales and use tax law, but the Craftsman case particularly is binding upon us in this instance, for to hold here that a construction contractor providing materials for a vast project is not a consumer, but a purchaser for resale, whereas a painting contractor using the few gallons of paint on a farmer's barn, having been previously by us declared an ultimate consumer, would be wholly contradictory and subject the decisions of this court to ridicule and derision. To support the theory for which defendant contends would require the overruling of the decision in the Craftsman case. Since we believe it to be proper and in line with our conclusions here, we

entertain no such idea. That there is not complete harmony in the decisions of various jurisdictions on this question is not to be denied. In the Craftsman case we cited with approval, *Commonwealth v. Gormly,* 173 Penn. St. 586, 34 Atl. 282; *Utah Concrete Products Corp. v. State Tax Com.,* 101 Utah 513, 125 P. (2d) 408; *Herlihy Mid-Continent Co. v. Nudelman,* 367 Ill. 600, 12 N.E. (2d) 638, which are among the cases upon which plaintiffs here rely. In that case we acknowledged also that there were decisions of other jurisdictions holding the opposite view, but plainly stated that we did not agree with them.

On behalf of defendant it is earnestly urged that since section 346 of chapter 16, id., is a general exemption provision, and since plaintiffs come under none of the exceptions therein contained, they must necessarily be covered by the Act, since it is specific in its terms and cannot by implication be stretched to exempt plaintiffs' operations as highway contractors. In view of what we have heretofore said, the answer to that one is simple. In order to be exempt from an Act, it first is necessary to be included therein. The Act here involved was never intended to cover operations such as are carried on by plaintiffs. None of plaintiffs and none of their activities fall within the provisions of the Act. The use of the highways by plaintiffs is purely incidental to their business as heavy construction contractors. *Elkins v. Schaaff,* 189 Wash. 42, 63 P. (2d) 421, 423. "Primary use of the highways is the general right of every citizen, to travel thereon and transport his property in the ordinary course of life, subject to reasonable police regulation. Secondarily, the highway is used by those who conduct thereon a business for profit." *McKay v. Public Utilities Commission,* 104 Colo. 402, 411, 91 P (2d) 965. He who uses the highways secondarily for the purpose of conducting thereon a business for profit, is the one intended to be covered by the provisions of the Act under consideration. The plaintiffs, being the owners of the property transported by them over the highway, and the

use of the highway in such instances being only incidental to the work at hand, are primary users and may not be subjected to the provisions of the Commercial Carrier Act.

The judgment of the trial court is reversed and the cause remanded with directions to further proceed in accordance with the views herein expressed, applicable to the prayer of the complaint.