445 P.2d 861

**Roy BOYES, Appellant,**

**v.**

**The STATE of Arizona et al., Appellees.**

**No. I CA-CIV 435.**

Court of Appeals of Arizona.

Oct. 10, 1968.

Rehearing Denied Jan. 23, 1969.

Review Granted March 25, 1969.

Stevenson, Warden & Smith, by William W. Stevenson and Jerry L. Smith, Flagstaff, for appellant.

Gary K. Nelson, Atty. Gen., Walter O. Holm, Sp. Asst. Atty. Gen., Phoenix, for appellee State of Arizona.

Minne & Sorenson, by Richard Minne, Phoenix, for appellees Arizona Corporation Commission et al.

HATHAWAY, Chief Judge.

Roy Boyes was charged with violation of A.R.S. § 40–660, for failure to comply with motor carrier licensing and taxing statutes, a misdemeanor, and in addition, was assessed a tax, as a "contract motor carrier of property," under A.R.S. § 40–641.[1] Maintaining that he is in fact a "private motor carrier, and therefore exempt from the tax," Boyes paid the tax under protest and sued for return of the monies paid and for a declaratory judgment that he was a private carrier. The trial court ruled against Boyes, affirming the order of the Corporation Commission, and he has appealed.

The tax assessed against Boyes involves his use of the public highways to transport pulpwood under two contracts with Southwest Forest Industries, Inc. (Southwest), one for 1962–1963 entitled "PULPWOOD CONTRACT, CUTTING AND HAULING" and the other for 1963–1964 entitled "PULPWOOD HARVESTING CONTRACT." The provisions of the contracts are essentially the same. The title of the contract was changed after the aforementioned criminal action was instituted. The apparent reason for the change will become evident in the course of this opinion, but, simply stated, it was part of an effort on the part of Boyes and Southwest to qualify Boyes' performance under the contracts as private rather than contract carriage.

Under the 1962–1963 contract, Boyes represented himself as being "engaged in the business of cutting and hauling pulpwood." The operation involved felling trees which had been premarked by the Forest Service, delimbing them and cutting them into lengths specified by Southwest, collecting and piling the brush, building and closing

1. Subsection A of A.R.S. § 40–601 contains the relative definitions:

 * * * * *

"3. 'Common motor carrier of property' means any person engaged in the transportation on any public highway by motor vehicle of property for compensation as a common carrier.

 * * * * *

"5. 'Contract motor carrier of property' means any person engaged in the transportation by motor vehicle of property, for compensation, on any public highway, and not included in the term common motor carrier of property * * *.

 * * * * *

"8. 'Private motor carrier' means any person not included in the term 'common motor carrier' or 'contract motor carrier' who transports by any motor vehicle in excess of six thousand pounds unladen weight property of which such person is the owner, lessee or bailee, *when such transportation* is for the purpose of sale, lease, rent or bailment, or *in the furtherance of any commercial enterprise* * * *.

"9. 'Public highway' means any public street, alley, road, highway or thoroughfare of any kind used by the public, or open to the use of the public as a matter of right for the purpose of vehicular travel." (Emphasis added.)

roads and trails, fighting any fires caused by himself or his crew, collecting the cut lengths and placing them in pallets and carrying them to a stand by means of a diesel-powered "Iron Mule," loading the pallets of logs on a two-ton truck, and hauling them approximately twelve miles to Williams, Arizona, where they were further transported to Southwest's mill at Snowflake, Arizona. The entire operation was carried on by five or six men in addition to Boyes. The only part of the work which Boyes conducted himself was the winching of the pallets onto the truck and the haul to Williams. Boyes' son operated the "Iron Mule" without compensation and the entire cutting operation was subcontracted to the other men in the crew.

At the trial the State alleged that Boyes was a "contract motor carrier" because all of his income was derived from hauling the wood and his entire work day was spent in doing so and, therefore, he was actually engaged in the business of hauling rather than in a business enterprise to which hauling was merely incidental.

The trial court's "findings of fact" included the following:

\* \* \* \* \* \*

"7. The Plaintiff was engaged in the transportation by motor vehicle of property for compensation on a public highway.

"8. Plaintiff devoted practically his entire time to the hauling operation.

"9. Title to the pulpwood being transported remained in Southwest Forest Industries, Inc.

"10. That the *primary business* of the Plaintiff *was harvesting and transporting* pulpwood from the forest to the yards of Southwest Forest Industries, Inc., and the *transportation portion of such business was not a mere incident thereto,* but was a substantial part thereof from which the plaintiff earned a profit.

"11. A substantial part of the total cost of service rendered by Plaintiff to Southwest Forest Industries, Inc., *in-*

*cluded a transportation cost of approximately $6.50 per cord,* made up of profit and expense of transportation.

\* \* \* \* \* \*

"13. The Plaintiff had no capital invested in the timber cutting operation, and sub-contracted the same to others.

"14. The transportation activity conducted by the Plaintiff hereinabove referred to *was not incidental to any commercial enterprise of the Plaintiff.* The said transportation was in furtherance of the commercial and industrial logging and lumber enterprise of Southwest Forest Industries, Inc." (Emphasis added.)

Among the conclusions of law, the trial judge ruled:

"The transportation engaged in by Plaintiff was not for the purpose of bailment, and Plaintiff was not engaged in the bailment business."

The court further concluded that the tax was legally assessed because Boyes was a "contract motor carrier."

 If Boyes' hauling activities are taxable, they are taxable under the theory that he was using the public highways for an "inordinate" purpose for his own gain and should therefore be required to pay a special fee for their maintenance, as our Supreme Court stated:

" \* \* \* business arrangements which look directly into the inordinate use of public highways to realize pecuniary benefits *(unless this use is merely incidental to other business activities)."* Campbell v. Commonwealth Plan, Inc., 101 Ariz. 554, 557, 422 P.2d 118, 121 (1966).

The cases in this jurisdiction make it clear that a person liable for the tax must actually be *in the business of hauling rather than merely hauling as a part of his business.* The question in this case then becomes: Is Boyes in the business of harvesting pulpwood, to which the hauling of the pulpwood is merely incidental (as Boyes maintains) or is he in the business of hauling pulpwood (as the State maintains)?

Boyes was paid $11 per cord of wood delivered at Williams. He paid $4.50 per cord to the subcontractors for felling, cutting, delimbing, brush-cleanup, etc. His son was not paid for operating the "Iron Mule." The trial court concluded that the entire profit of $6.50 was realized from the trucking operation. This conclusion ignores the undisputed facts. Boyes testified that he drove the truck so that he could oversee the entire operation. Because he subcontracted the major portion of the work does not preclude his entitlement to a profit for that work. If, for example, a general contractor subcontracts an *entire* operation it does not follow that he is no longer the contractor nor does it follow that he is not entitled to a profit on the contract.[2] Also to be considered are the services of Boyes' son in operating the "Iron Mule." Boyes testified that these services would, otherwise, have cost him $2.25 per hour. Consideration should also be given Boyes' contingent liability in the amount of $3,000, in case his men started a fire, and the duty to employ his men in the fighting of any such fire.

█ We must view the entire operation, rather than the isolated truck-driving portion personally conducted by Boyes. Four or five men worked to prepare the pulpwood. One man operated the "Iron Mule" gathering it and stacking it for loading on the truck. Boyes loaded the truck and made the short drive to Williams. We conclude that the hauling activity was incidental to the primary business enterprise of harvesting pulpwood, and hold that Boyes is a "private motor carrier of property" and not subject to the tax assessed and paid.

All of the cases in point which we have found or which have been called to our attention by counsel support this conclusion. Our statute is essentially the same as the federal Interstate Commerce Act, 49 U.S.

C.A. § 303(a), et seq.[3] Visco v. State ex rel. Pickrell, 95 Ariz. 154, 388 P.2d 155 (1964). We will look first to federal cases.

The leading case appears to be L. A. Woitishek Common Carrier Application, 42 M.C.C. 193 (1943), involving carriage of construction materials in interstate commerce. The delivery price was determined by adding ten per cent profit plus a fee for transportation to the purchase price. Woitishek claimed that selling building material was his primary business and the transportation of those materials was incidental. He further claimed that the transportation charge was only meant to cover transportation expenses. The Interstate Commerce Commission held that he was a "private carrier" and not subject to Interstate Commerce Commission regulation. The Commission stated that the receipt of compensation identifiable for transportation was not conclusive and neither was the existence of a noncarrier business to which transportation may have appeared to be incidental. The Commission left future determinations to the "particular facts" of each case, but determined that Woitishek's transportation activities were performed incidentally to his "direct sales" business, "without any purpose to profit from the transportation as such," and that at least 60 per cent of his income was from noncarrier operations.

The *Woitishek* decision applied what has become to be known as the "primary business test." This test has been described in Brooks Transportation Co. v. United States, 93 F.Supp. 517 (1950), affirmed without opinion, 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951), as follows:

"In other words, if it is established that the primary business of a concern is the manufacture or sale of goods which the owner transports in furtherance of that business and the transportation is merely incidental thereto, the carriage of such

---

2. For example, the definition of "general building contractor" includes "to do or superintend the whole or any part thereof." See A.R.S. § 32–1102, subsec. 1.

3. Except that jurisdiction under Interstate Commerce Act depends upon interstate commerce.

goods from the factory or other place of business to the customer is private carriage even though a charge for transportation is included in the selling price or is added thereto as a separate item." 93 F.Supp. at 522.

Subsequent federal decisions have made application of the "primary business test" in a similar manner. Red Ball Motor Freight Inc. v. Shannon, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964); Shippers Cooperative, Inc. v. Interstate Commerce Commission, 308 F.2d 888 (9th Cir. 1962); Taylor v. Interstate Commerce Commission, 209 F.2d 353 (9th Cir. 1953), cert. denied, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098; Church Point Wholesale Beverage Co. v. United States, 200 F.Supp. 508 (1961); Interstate Commerce Commission v. Clayton, 127 F.2d 967 (10th Cir. 1942); Interstate Commerce Commission v. Tank Car Oil Corp., 151 F.2d 834 (5th Cir. 1945).

We next look to the decisions of our sister states. The Washington statute regulating road transportation before amendment in 1937 was very similar to ours. Under the prior statute, the Washington Supreme Court held, in Elkins v. Schaaf, 189 Wash. 42, 63 P.2d 421 (1936), that loggers who hauled logs for a short distance on public highways to a river landing were private carriers. The court said (at 423):

"The only use the respondents desire to make of the highways is in connection with their business of logging contractors and in carrying out the terms of their contracts with the Panhandle Lumber Company. The use of the highways by the respondents is incidental only to their business as logging contractors."

There was no contract to haul as such, but only one for the delivery of logs to a mill—just as in the present case.[4] Colorado Contractors Ass'n Inc. v. Public

Utilities Com'n, 128 Colo. 333, 262 P.2d 266 (1953).

The cases in our own jurisdiction are in accord with the federal cases in the application of the "primary business test." Our Supreme Court, in the recent case of Arizona Corporation Commission v. Continental Security Guards, Ariz., 443 P.2d 406 (1968) (holding that armored car carriers were in the business of keeping money secure rather than transporting money and, therefore, a "private carrier") states of the "primary business test":

"The real test is whether the use of the highway is of such a nature that it is not a part of the other business and for that reason the public interests requires that it be regulated as a common carrier, or whether it is of such a nature that it must be classified as a contract carrier. We do not find that either test exists with respect to Continental as it is presently operated. The protective services are the main features of Continental's business. The armored car is merely a part of those protection features."

In Killingsworth v. Morrow, 83 Ariz. 23, 315 P.2d 873 (1957), our Supreme Court held that one who is in the business of selling, servicing and repairing new and used cars is a private carrier insofar as he conducts an incidental business of towing vehicles for the purpose of repairing them. A similar case, also resulting in a determination that the operator was a private carrier, is Arizona Corporation Commission v. S. & L. Service, Inc., 93 Ariz. 380, 381 P.2d 104 (1963). In the latter case, S. & L. operated four tow trucks, making approximately 139 tows per month on the average, mostly for AAA Auto Club members. Some roadside mechanical service was provided as well as garage service.

Williams v. State ex rel. Smith, 2 Ariz. App. 291, 408 P.2d 224 (1965) probably

---

4. The Washington court later found these same loggers to be contract carriers, Elkins v. Schaaf, 4 Wash.2d 12, 102 P.2d 230 (1940), but only because the legislature amended the Washington statute to preclude application of the "primary business test."

best supports our conclusion that Boyes is a private carrier. Though Williams was a "house mover," the title was said to be misleading because only about ten per cent of Williams' work consisted of moving houses. The other 90 per cent was consumed in readying the houses for moving and resetting them after the move. Citing Quick Aviation Co. v. Kleinman, 60 Ariz. 430, 138 P.2d 897 (1943), the court said that the fact that income was derived from the actual moving of the houses did not deprive Williams of his status as a private carrier so long as the moving of houses was an integral part of his primary business of dismantling and resetting houses.

In the light of all of these cases, and on the special facts of this case, we hold that the trial court's findings and conclusions are contrary to the evidence and the law.

The State contends that Boyes' operation does not come within the definition of "private motor carrier" because he is not transporting "for the purpose of sale, lease, rent or bailment." In view of our conclusion that the transportation "in the furtherance of any commercial enterprise," which is an alternative exemption under the statute, we need not consider that contention.

The State also contends that, because Southwest is apparently paying Boyes' legal expenses, Southwest and Boyes have thereby admitted that Boyes' harvesting operation is actually in furtherance of Southwest's business interest rather than those of Boyes. We disagree with that conclusion. Since it is logical to assume that the tax would raise Boyes' cost of preparing the wood, it follows that Southwest has an interest in keeping the cost down. The fact that it may have volunteered to pay legal expenses is not conclusive that Boyes did not have a separate business enterprise. We also think that Boyes' statement on his income tax returns that he was a "pulpwood hauler," and the use of the word "HAULING" in the 1962-1963 contract, are not controlling in light of the "primary business test." As has

been seen from the cases, the fact that one hauls, even for compensation, does not preclude the status of private carrier.

A contrary holding would seem to be unsound in light of the Williams case. There the "primary business test" was applied with the conclusion being that a "house mover" is only incidentally involved in "moving" houses. We do not believe that Boyes was *more* than incidentally involved in the moving of pulpwood.

Reversed.

KRUCKER, J., concurs.
NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.

MOLLOY, Judge (dissenting):

This is a suit to recover tax moneys paid under protest and to secure a declaratory judgment that the plaintiff is not subject to the regulatory provisions pertaining to either common or contract carriers. There is no contention made by the defendants that the plaintiff is a common carrier, and therefore we are not concerned with problems pertaining to regulated monopoly. See Visco v. State ex rel. Pickrell, 95 Ariz. 154, 388 P.2d 155 (1963).

The taxes sought to be recovered are those assessed by the defendant Motor Vehicle Division for the plaintiff's operations between June 9, 1962 and October 4, 1963, upon gross receipts of $22,298.51. The determination that this amount was from a contract carrier operation was made by a field auditor of the Motor Vehicle Division. He estimated that 38.56 per cent of the gross receipts of plaintiff were attributable to loading and transportation of pulpwood. This estimate was based upon an examination of the plaintiff's records and those of Southwest Forest Industries, Inc., and interviews with the plaintiff and others in this industry.

Four days of testimony to the trial court was devoted to the issue of whether the transporting operations of the plaintiff were an integral part of the "harvesting

industry," or whether the transportation aspects of this operation were a substantial part of the business and separable from the other responsibilities assumed by the plaintiff under his contracts with Southwest Forest Industries, Inc.

Of interest in making this determination is testimony to the effect that Southwest Industries, Inc., during the approximate first year of its pulpwood operations in 1961–1962, did its own "cutting" and employed independent contractors to do the hauling. There is testimony that a substantial portion of the contractors with harvesting and hauling contracts with Southwest subcontract their hauling to others, paying between $4 and $6 per cord for this work. Other truckers sometimes used a winch built onto the truck for loading, while the plaintiff used an "Iron Mule." In this case, the plaintiff subcontracted the cutting, which included the gathering and stacking of the wood, for $4.50 per cord, keeping $6.50 per cord for the loading and hauling.

The plaintiff testified that his cost "to haul" the wood was $1.62 per cord and an employee of Southwest, called as a plaintiff's witness, presented a written estimate that plaintiff's attributable costs of transportation was $2.50 a cord.

Based on these facts, and the facts previously delineated in the majority opinion, it is certainly within the purview of the evidence to regard at least 38.56 per cent of the gross income as coming from the loading and hauling phase of this operation, and to find a profit motive in so engaging.

The pertinent statutory language is fairly clear. A "contract motor carrier of property" is defined in the statutes as a person " * * * engaged in the transportation by motor vehicle of property, *for compensation, on any public highway * * *.*" 12 A.R.S. § 40–601, subsec. A(5), as amended. (Emphasis added.) The contrasting definition of a "private motor carrier" is, insofar as applicable to this case:

" 'Private motor carrier' means any person not included in the term 'common motor carrier' or 'contract motor carrier' who transports by any motor vehicle * * * when such transportation is for the purpose of sale, lease, rent or bailment, or in the furtherance of any commercial enterprise, but ownership of the property transported shall not be accepted as sufficient proof of a private motor carrier operation if the carrier is in fact engaged in the transportation of property for hire, compensation or remuneration, *or if such transportation operations are conducted for profit and not merely as an incident to a commercial enterprise,* provided that towing of disabled vehicles by tow trucks operated in connection with an automobile repair or service business or a wrecking yard shall be deemed to be incidental to a commercial enterprise, and the operator thereof shall be deemed to be a private motor carrier when engaged in such operations. (Emphasis added). 12 A.R.S. § 40–601, subsec. A(8), as amended.

The cases relied upon in the majority opinion all indicate that if transportation of property is performed for a profit and not merely as an incident to a principal commercial enterprise, then there is a contract carrier business. Further, these decisions stand for the proposition that merely combining a carrier operation with a non-carrier operation does not render the whole non-carrier. For instance, Red Ball Motor Freight, Inc. v. Shannon, 377 U.S. 311, 4 S.Ct. 1260, 12 L.Ed.2d 341 (1964), quotes with approval from an Interstate Commerce decision of Lenoir Chair Co. Contract Carrier Application, 51 M.C.C. 65 (1949), aff'd sub nom. Brooks Transportation Co. v. United States, 93 F. Supp. 517, aff'd, 340 U.S. 925, 71 S.Ct. 501, 95 L.Ed. 668 (1951), in part, as follows:

" '* * * If, on the other hand, the primary business of an operator is found to be manufacturing or some other non-carrier commercial enterprise, then it must be determined whether the motor

operations are in bona fide furtherance of the primary business *or whether they are conducted as a related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion, they cannot be both.'"* (Emphasis added.) 377 U.S. at 315, 84 S. Ct. at 1262, quoting from 51 M.C.C. at 75.

A previous decision of the Interstate Commerce Commission, Woitishek Common Carrier Application, 42 M.C.C. 193 (1943), takes the same view:

"After careful study, it seems clear to us that the transportation 'for compensation' contemplated by both the common and contract definitions as distinquished from the transportation 'for the purpose of sale, lease, rent, bailment, or in the furtherance of any commercial enterprise' contemplated by the private-carrier definition is transportation which is supplied *with a purpose to profit* from the effort *as distinquished from* a purpose merely *to make good or recover the cost of transportation* furnished in the furtherance of some other primary business or transaction." (Emphasis added; "purpose to profit" italicized in original) 42 M.C.C. at 201.

There is certainly no conclusive evidence in this record that the plaintiff did not enter into this enterprise with the purpose in mind of making a profit from the transportation end of the business. The cost figures supplied by the plaintiff would indicate that he was, in fact making a substantial profit from this phase of the operation.

Cases such as Williams v. State ex rel. Smith, 2 Ariz.App. 291, 408 P.2d 224 (1965), are clearly distinguishable by reason of the facts of that case:

"The testimony and the findings of the court reflect that, normally * * *. Approximately 10% of the time and effort is used in transporting the house from one location to another."

Williams v. State ex rel. Smith, 2 Ariz. App. 292, 408 P.2d 225.

Here, the plaintiff devoted substantially all of his time to the transportation phase of this operation and he had practically no moneys invested in equipment concerned with the "harvesting" of this wood.

None of the cases cited in the majority opinion, which hold that a private carrier status existed, are more than remotely related to the facts of this case, with the exception of Elkins v. Schaaf, 189 Wash. 42, 63 P.2d 421 (1936). This case, though of interest, is clearly distinguishable under the facts as indicated by the following quotation from *Elkins:*

"To arrive at one of the landings, it is necessary to cross the highway. To reach the other landing, it is necessary to cross a highway and follow it for a distance of approximately four miles in approaching the landing."

63 P.2d at 422.

In *Elkins,* the delivery of the logs appears to have been substantially all by trails in the forest and by water transportation. It was clearly within the possibilities of that evidence for the court to conclude, as it did, that transportation was " * * * incidental only to their business as logging contractors." Here, the evidence is undisputed that of a haul of 11–12 miles, 9–10 miles were on a public highway.

If one can glean anything out of the federal decisions construing the similar statutes pertaining to interstate commerce, it is that each case must be judged "upon its own particular facts" (quote from Woitishek Common Carrier Application, 42 M.C.C. at 206). The facts here have been determined by a trial judge after listening to evidence which does not all lead in the same direction. We are duty bound to give his factual determination such credit as the evidence will support. This the majority opinion does not do. This judgment should be affirmed.