Joseph F. Gambino, *et al.*

*v.*

Carroll Jackson, Trading as Jackson Transfer Co. and Nationwide Mutual Ins. Co., *a corp.*

(No. 12417)

Submitted September 14, 1965.   Decided November 30, 1965.

*Friedlander & Friedlander, Mark P. Friedlander, Jr.,* Washington, D. C., *Steptoe & Johnson, Kingsley R. Smith, Harry E. Moats,* for appellant.

*McDougle, Davis Stealey & Morris, Fred L. Davis, John R. Morris,* for appellee.

CAPLAN, JUDGE:

This is an appeal from a declaratory judgment proceeding instituted in the Circuit Court of Ritchie County wherein the appellants, Joseph F. Gambino, III, Joseph F. Gambino, his father, and Ruth A. Gambino, his mother, sought a judicial determination of the coverage of a certain insurance policy issued by the appellee, the Nationwide Mutual Insurance Company. There being no controversy as to the facts, the Gambinos, joined by Carroll Jackson, filed a motion for summary judgment, and Nationwide Mutual Insurance Company filed a cross-motion for summary judgment.

The trial court, after a hearing upon the cross-motions, granted the motion of the Nationwide Mutual Insurance Company and denied the motions for summary judgment by the Gambinos and Jackson, each of whom now prosecutes this appeal.

This controversy arises out of a collision which occurred on Route 50, in Ritchie County, West Virginia, on September 26, 1961, between an automobile driven by Joseph F. Gambino, III and a Ford dump truck owned by Carroll Jackson and operated by his son, Robert Paul Jackson. In this head-on collision Joseph F. Gambino, III and his parents were severely injured. Each of the Gambinos instituted a separate action for personal injuries and, in addition, this declaratory judgment suit was begun.

Carroll Jackson, trading as Jackson Transfer Company, owned five trucks. These consisted of a moving van, a small Chevrolet moving van and three dump trucks, one of which, a spreader type dump truck used largely for spreading lime, was involved in the collision in the instant case. Jackson had an Interstate Commerce Commission Certificate of Convenience and Necessity under which he was entitled to engage in moving household goods on irregular routes between points in Ritchie County, West Virginia, to points in Maryland, Ohio, Pennsylvania and elsewhere in West Virginia. The dump truck involved in this case was not covered under the Interstate Commerce Commission Certificate of Convenience and Necessity, nor by the permit issued to Jackson by the Interstate Commerce Commission.

In addition to the transfer business, Jackson was also engaged in the business of selling and delivering agricultural lime to farmers in and around Ritchie County. These farmers, as participants in a governmental program, secured allotments of lime from the Agricultural Stabilization Committee of the United States Department of Agriculture, Agricultural Program Service. The allotment was secured through special forms provided by the government, after which an order for the amount specified thereon was placed with Jackson or with any other vendor of lime.

For the purpose of filling these orders or any other orders which he may receive for lime, Jackson purchased lime by the open carload from the Basic Lime Company, which was located near Cleveland, Ohio. He could, of course, purchase lime from any company he desired. His purchases of lime from Ohio were not necessarily based on the orders which he had received. Instead, he bought lime in such quantities he thought he would need to fill the demands of the farmers in that area. Pursuant to his order, the lime was shipped by Basic Lime Company in Ohio to Jackson, being consigned to him at the railroad depot at Pennsboro in Ritchie County. Jackson then unloaded the contents of the railroad car into his trucks and

delivered the lime to the farmers who had ordered it. In the event that he had more lime than orders the excess lime was stored at his farm until a market therefor was found. His sale of lime was not confined to the farmers who had placed orders with him. He could sell to whomever he pleased, the price being governed only by the competition of the market.

Jackson paid the Basic Lime Company for the lime. He then sold it to his customers at a price which was the same regardless of how far it had to be hauled. His profit was the difference between the amount paid for the lime and that which he received. Of the sum received by Jackson the government paid a part and the farmer paid the balance. He had made several sales of lime, however, which were not involved in the government program.

At the time of the accident the lime truck involved therein was empty and was enroute from Jackson's farm to the railroad depot for the purpose of unloading a carload of lime for delivery.

On September 26, 1961, the date of the collision, there was in full force and effect a Motor Carrier Automobile Bodily Injury Liability and Property Damage Liability Certificate of Insurance, issued by the appellee, Nationwide Mutual Insurance Company, in favor of the appellant, Carroll Jackson, trading as Jackson Transfer Company. Pursuant to the Interstate Commerce Act this certificate was on file with the Interstate Commerce Commission and certified that there existed in full force and effect sufficient comprehensive liability insurance in favor of Jackson to cover bodily injury to or the death of any person in sums as prescribed in Form B. M. C. 90, namely, $100,000.00 limitation for bodily injuries or death of all persons injured or killed in any one accident, subject to a limit of $25,000.00 for bodily injury or death of any one person. This certificate of insurance provides "coverage or security for the protection of the public required with respect to the operation, maintenance or use of motor vehicles under certificate of public convenience and necessity or permit issued to the Insured by the Interstate Commerce Com-

mission or otherwise in transportation subject to Part II of the Interstate Commerce Act and the pertinent rules and regulations of the Interstate Commerce Commission, regardless of whether such motor vehicles are specifically described in the policy or policies or not." The effect of this policy is to afford to Jackson liability insurance coverage for any vehicle operated by him which was, at the time of an accident, engaged in interstate commerce and therefore subject to Part II of the Interstate Commerce Act.

In addition to the above insurance, Jackson had a policy covering the operation of the Ford dump truck which was involved in the collision. This was a policy of bodily injury and property damage liability subject to a limit of $10,-000.00 for bodily injury or death of one person and a limit of $20,000.00 for bodily injury to or death of all persons injured or killed in any one accident. No question is raised in this proceeding as to the coverage of this policy.

The appellants, the Gambinos and Jackson, contend that the 1950 Ford dump truck, at the time it was involved in the collision, was engaged in transportation subject to Part II of the Interstate Commerce Act. The appellee, Nationwide Mutual Insurance Company, contends that said truck was not then engaged in transportation subject to Part II of the Interstate Commerce Act. The sole question for decision, therefore, is whether Jackson's dump truck, at the time of the collision, was engaged in interstate commerce, which constitutes transportation subject to Part II of the Interstate Commerce Act. If that question is answered in the affirmative the certificate filed with the Interstate Commerce Commission is applicable and the insurance policy to which it pertains lends coverage to this accident. If answered in the negative the said certificate and the insurance provided thereby are not applicable to this accident.

In determining whether a particular transaction is one in interstate commerce, substance, and not form, controls. Interstate commerce is not a technical legal conception but a practical one drawn from the course of business and what

falls within it must be determined from a consideration of the established facts and business methods pertaining to each case. *Heyman* v. *Hays,* 236 U. S. 178, 59 L. Ed. 527, 35 S. Ct. 403; *Public Utilities Commission* v. *Landon,* 249 U. S. 236, 63 L. Ed. 577, 39 S. Ct. 268; *Federal Trade Commission* v. *Pacific States Paper Trade Association,* 273 U. S. 52, 71 L. Ed. 534, 47 S. Ct. 255; 15 Am. Jur. 2d, Commerce, § 3.

The evidence adduced at the trial of this case reveals that at the time of the accident Jackson was in the agricultural lime business; that he placed his order for lime with Basic Lime Company, although he could have purchased it elsewhere if he had desired; that such orders were not based solely upon the orders for lime he had received from farmers participating in the governmental program; that Basic Lime Company billed him for the lime and for the freight charges; that the lime was shipped and consigned to Jackson at Pennsboro; that Jackson paid Basic Lime for such shipments of lime; that Basic Lime did not know of or care about the ultimate disposition of the lime by Jackson; that he paid $5.00 per ton and received $7.50 per ton for such lime; that he received the same amount regardless of the distance the lime was to be hauled; that he was paid for the lime, not the transportation thereof; that he never held himself out to the general public as a hauler of lime for hire; that he was free to sell the lime to anyone, it not being earmarked for any particular customer; that upon loss of any lime in delivery he bore such loss; and that he did not have a certificate from the Public Service Commission, nor did he file tariffs, for the delivery of his lime.

It is asserted by the appellants that in these circumstances Jackson, in the delivery of lime to his customers, was engaged in interstate commerce. In support thereof, the appellant cites *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 91 L. Ed. 2010, 67 S. Ct. 1560, and quotes therefrom as follows: "When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of

one state does not make that portion of the trip any less interstate in character." With this statement of the law we are in complete agreement. We also agree that it is applicable to the *Yellow Cab* case which, where pertinent, involved the transportation of train passengers from one railroad station to another in Chicago.

That case is clearly distinguishable from the instant case. There the taxicab was a mere link in transporting a passenger from his original station to an ultimate preconceived destination. In the case at bar, so far as Basic Lime Company was concerned, the station at Pennsboro, West Virginia, was the final destination of the lime. There Jackson, the purchaser, could dispose of the lime in any manner he desired. The ultimate consumers of the lime were Jackson's customers, not Basic Lime's. Its contract was with Jackson, not the farmers who used the lime. Herein, Jackson's sale and delivery of lime to his customers is not a mere link in the transportation thereof from Basic Lime to an ultimate consumer. The legal proposition above quoted, therefore, is not applicable to the principal case.

The appellants also cite *Wycoff Co.* v. *Public Service Commission of Utah*, 195 F. 2d 252, in support of their contention that Jackson was engaged in interstate commerce when the accident occurred. The Court there said that if there is continuing intent that the goods shall be transported until they reach a designated place, the entire transportation is a continuing one, notwithstanding that there may be temporary stoppage enroute for a particular purpose. The *Wycoff* case involved the transportation of motion picture films and newsreels which were shown by one exhibitor and forwarded to another until they were eventually returned to the national distributor. The exhibitors had a mere license to use the film, no sale thereof being involved. Certainly, in such circumstances, there was a continuing intent that the films be transported until they reached a designated place—the national distributor. The distributor sent the films and they were involved in interstate commerce, notwithstanding the temporary stoppages, until the films were returned to them. Clearly the

legal principles expressed in the *Wycoff* case are not applicable to the case under consideration. Here there was no intent that the lime was to be transported from Basic Lime Company to the ultimate consumer. As heretofore noted, Basic Lime had no knowledge of whom the ultimate consumer would be. The final destination of the lime from Basic Lime Company was the depot at Pennsboro, where it was consigned to Jackson. That being so, there was no stoppage from its origin to its intended destination.

The following statements in 15 Am. Jur. 2d, Commerce, § 50, applied to the factual situation of this case, readily demonstrate that the interstate character of the instant transaction ceased to exist when the lime arrived at the depot in Pennsboro, consigned to Jackson. "* * * In order for local transportation of goods to constitute interstate or foreign commerce, there must be such continuity of movement as to show that shipment to the ultimate destination was within the original contemplation of the shipper and that stoppage or change of carriers is merely incidental to the shipment. Mere uninterrupted movement of goods will not necessarily constitute the local transportation a part of an interstate or foreign shipment; in order to make the local carriage interstate or foreign commerce, it must be shown that the shipper, when he made the original shipment, intended or had within his contemplation transportation to a point outside the state if the local transportation preceded the interstate or foreign traffic or, if it succeeded it, to the final local destination."

Further demonstrating this point is the following language: "Interstate commerce ordinarily continues as such until it reaches the point where the parties originally intended that the movement should finally end." 15 Am. Jur. 2d, Commerce, § 59. See also *Binderup* v. *Pathe Exchange*, 263 U. S. 291, 68 L. Ed. 308, 44 S. Ct. 96; *Southern Pac. Co.* v. *State of Arizona*, 249 U. S. 472, 63 L. Ed. 713, 30 S. Ct. 313; *Western Union Telegraph Company, et al* v. *Foster*, 247 U. S. 105, 62 L. Ed. 1006, 38 S. Ct. 438, 1 A. L. R. 1278; *Pittsburgh and Southern Coal Company* v. *Bates*, 156 U. S. 577, 39 L. Ed. 538, 15 S. Ct. 415; *Danciger* v.

*Cooley*, 248 U. S. 319, 63 L. Ed. 266, 39 S. Ct. 119; *Rosenberger* v. *Pacific Express Company*, 241 U. S. 48, 60 L. Ed. 880, 36 S. Ct. 510; and *United States* v. *Freeman*, 239 U. S. 117, 60 L. Ed. 172, 36 S. Ct. 32.

In the instant case the parties, Basic Lime Company and Jackson, originally intended that the movement should finally end at the depot in Pennsboro. Basic Lime did not know who would eventually receive the lime, nor was it in any manner concerned with the ultimate disposition thereof. So far as the lime company was concerned, the consignee of the lime may have used it for his own purpose.

In the circumstances of this case, as heretofore set out, we find that the truck involved in the accident was being used pursuant to the mercantile business of buying and selling lime. As such, Jackson was a private carrier and not a common or contract carrier. He was engaged in the business of selling lime which he had purchased for that purpose. He was not paid for the transfer thereof but sold it for the same price, regardless of whether he delivered it one mile or twenty miles. Neither did he ever haul lime for hire.

An examination of the provisions of Part II of the Interstate Commerce Act reveals that private carriers are not governed by that act. In § 302 of Title 49 of the act it is provided: "(a) The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce * * *." Section 303 defines common carriers, contract carriers and private carriers. Section 303 (16) provides: "The term 'motor carriers' includes both a common carrier by motor vehicle and a contract carrier by motor vehicle." It is obvious, under the well established rule, *expressio unius est exclusio alterius*, that private carriers are not covered by the regulations provided for in Part II of the Interstate Commerce Act. Since the certificate of insurance involved in this case covers only transportation subject to Part II of the Interstate Commerce Act, Jackson's operation as a private carrier is not included therein.

314

The appellants urge that the trial court erred in failing to apply the primary business test in this case. They say that if the primary business purpose of an operation is the supplying of transportation, then it does not matter who is the owner of the transported goods or what the measure of compensation is for those goods. In support thereof, the appellants cite and quote from *Red Ball Motor Freight, Inc. v. Shannon*, 377 U. S. 311, 12 L. Ed. 2d 341, 84 S. Ct. 1260. In that case the appellees dealt in livestock and commodities from a place of business in San Antonio, Texas. They made deliveries in their own trucks to customers in Louisiana and bought sugar at Supreme, Louisiana, which they backhauled five hundred and twenty five miles for resale to customers in San Antonio. The Interstate Commerce Commission held that this backhaul was not transportation within the scope, and in furtherance, of a primary business enterprise and, therefore, was not exempt from the Interstate Commerce Act. This ruling was reversed by a three-judge District Court. In affirming that decision, the Court quoted with approval the governing standard, as follows:

> "If the facts establish that the primary business of an operator is the supplying of transportation for compensation then the carrier's status is established though the operator may be the owner, at the time, of the goods transported and may be transporting them for the purpose of sale. . . . . If, on the other hand, the primary business of an operator is found to be manufacturing or some other noncarrier commercial enterprise, then it must be determined whether the motor operations are in bona fide furtherance of the primary business or whether they are conducted as a related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion, they cannot be both."

The Court said, in applying the governing standard, that the factual setting of each case must be analyzed. Making such analysis, the Court concluded that the backhaul operations of the appellees was within the scope, and in furtherance, of a primary business enterprise.

Applying the above quoted governing standard to the facts of the case at bar and the primary business test, as urged by the appellants, we are of the opinion that the transportation of lime by Jackson was within the scope, and in furtherance, of a primary business enterprise. Although Jackson had a Certificate of Convenience and Necessity which permitted him to transport household goods in interstate commerce, he was not thereby precluded from operating another business enterprise. In this business he used dump spreader type trucks, which would not ordinarily be used in his transfer business, and which were not included in the above certificate. There is nothing in this record to show that Jackson's lime business was a sham to avoid regulation as a common carrier.

Inasmuch as Jackson was a private carrier of lime, pursuant to and in furtherance of his business of buying and selling agricultural lime, his truck, when it collided with the Gambino vehicle, was not engaged in transportation subject to Part II of the Interstate Commerce Act. Therefore, the insurance, evidenced by the certificate filed by the appellee with the Interstate Commerce Commission, does not provide coverage for this accident.

For the reasons stated herein the judgment of the Circuit Court of Ritchie County is affirmed.

*Affirmed.*