BILL RUSSELL, d/b/a Frank Russell and Son Trucking Company, Plaintiff-Appellant, v. JIM RUSSELL SUPPLY, INC., *et al.*, Defendants-Appellees.—JIM RUSSELL SUPPLY, INC., Plaintiffs-Appellees, v. WILLIAM C. RUSSELL, d/b/a Frank Russell and Son Trucking Company, Defendant-Appellant.

Fifth District   No. 5—88—0699

Opinion filed May 15, 1990.—Rehearing denied July 30, 1990.

856

HARRISON, J., dissenting.

John Paul Womick & Associates, Chartered, of Carbondale, for appellant.

Robert E. Shaw, of Mitchell, Neubauer & Shaw, P.C., of Mt. Vernon, for appellees.

JUSTICE WELCH delivered the judgment of the court:

Plaintiff, Bill Russell, d/b/a Frank Russell and Son Trucking Company, filed suit seeking an injunction and damages against defendants Jim Russell and Jim Russell Supply, Inc. (hereinafter, JRS), for breach of a restrictive covenant not to compete contained in Jim and Bill Russell's partnership dissolution agreement. Defendants brought a separate action against plaintiff for declaratory judgment with respect to the same contract and the matters were consolidated. Defendants contend, both as affirmative defenses to the contract claim and as allegations in the declaratory judgment suit, that JRS's use of trucks and storage facilities did not violate the restrictive covenant; that the restrictive covenant violated public policy because it was unreasonably broad in geographic area and time; and that the covenant was unenforceable for want of consideration.

Plaintiff appeals from summary judgment entered in favor of defendants by the circuit court of Franklin County at the close of plaintiff's case. The trial judge found that the restrictive covenant embodied in paragraph eight of Bill and Jim Russell's partnership dissolution agreement was unenforceable, ruling that the breach of contract action and injunction sought against Jim Russell and his corporation failed as a matter of law. On appeal we must determine whether the trial judge erred as a matter of law when he ruled that the restrictive covenant was unenforceable because of lack of consideration and because there was no value placed on goodwill. We will also address the secondary finding of the court that even if the restrictive covenant was enforceable, Jim's purchase and sale of

magnetite was not a sham to disguise operation in the trucking business and so there was insufficient proof that defendant Jim Russell breached said covenant.

Bill and Jim Russell are brothers whose family has been in the trucking business in West Frankfort, Illinois, since 1913. Their grandfather founded Frank Russell and Son Trucking; Bill and Jim began working there in the early 1950's and bought the business from their father, Don Russell, in 1977. In June 1985 they mutually decided to dissolve the partnership and Bill offered to buy out Jim's 50% share of the business, according to their partnership agreement. They agreed upon $1,100,000 as the value of the tangible partnership assets and the terms of sale, and Jim prepared a handwritten memorandum of that agreement. Bill agreed to pay Jim $550,000 cash, transfer ownership of a 1985 pickup truck valued at $10,000, assume full liability for a partnership note and complete the private annuity payments to their father's widow pursuant to the 1977 business purchase agreement. After deciding upon the sales price and terms, Bill asked Jim if they could include a provision in their agreement that Jim would not go into the trucking business. Jim agreed, saying that it would be silly for them to compete.

Bill contacted a local attorney to draft their agreement and asked the attorney to draft the restrictive covenant which was incorporated in the dissolution agreement as follows:

> "Seller hereby agrees that he will not engage in the business of trucking, hauling, general moving and storage anywhere within a radius of 100 miles of the City of West Frankfort, Illinois, in any capacity whatsoever, directly or indirectly, for a period of 10 years from the date of the execution of this agreement."

The bill of sale which was attached to the dissolution agreement listed the partnership assets such as the trucks and trailers, office equipment and Interstate Commerce Commission permits, but did not specifically list "goodwill." The exclusive use of the company name was also transferred to Bill by way of the dissolution agreement. The attorney who drafted the agreement allocated the $560,000 purchase price among the tangible assets of the business for purposes of future depreciation but did not allocate an amount for the restrictive covenant, which is a depreciable asset. Both Bill and Jim read the document prior to signing it at the closing, which took place on July 15, 1985.

In November 1985, Jim contacted American Minerals, Inc., in Rosiclare, Illinois, wanting information about its ability to grind

magnetite for him. Magnetite is a dry, powdered iron ore used to clean coal. American Minerals processes and sells magnetite, among other products, according to its customers' specifications. American Minerals had been unable to break into the magnetite market in Southern Illinois until contacted by Jim. In January 1986 Jim incorporated Jim Russell Supply, Inc., to purchase and sell mining supplies. Shortly thereafter, he and Marty Schlicting visited American Minerals' operation. JRS later hired Schlicting as a sales representative.

JRS purchased its first magnetite from American Minerals in April 1986. American Minerals gave JRS space in one of its buildings for an office. In August 1986, JRS installed storage bins for the magnetite at American Minerals and at its location in West Frankfort. American Minerals installed certain equipment on the bins to facilitate transfer of the magnetite to and from the bins and reduced the price per ton of its magnetite sold to JRS to help it pay for installation of the bins.

The only storage capability JRS had before August was in the two pneumatic trailers it owned. Pneumatic trailers are specially designed to transport magnetite. JRS also owned two trucks and always delivered its own product rather than hiring a carrier, even in times of peak orders. Occasionally orders were taken before JRS picked up the product and deliveries were made from American Minerals directly to the customer. Turnover time of the magnetite inventory in JRS' bins was less than two weeks.

Most of JRS' customers were coal mines to which Frank Russell and Son Trucking had made delivery of magnetite for another supplier, Reiss-Viking. Most of the mines to which Frank Russell and Son Trucking made deliveries were located within 100 miles of West Frankfort. The only other supplier of magnetite in southern Illinois before defendant started doing business was Prince Manufacturing.

Marty Schlicting had previously been employed as a salesman by Reiss-Viking. Frank Russell and Son Trucking was the exclusive carrier of magnetite for Reiss-Viking and had a Reiss-Viking phone line installed on the premises in order to facilitate placement of orders. Although Frank Russell and Son Trucking delivered other products for other customers, magnetite delivery for Reiss-Viking was a major part of plaintiff's business. Plaintiff's shipping business has declined since JRS began selling magnetite.

Frank Russell and Son Trucking holds both Interstate Commerce Commission and Illinois and Missouri Commerce Commission authorities to transport magnetite as a contract or common carrier. Defend-

ant JRS considers itself a private carrier because it transports its own product and is not required to hold authorities for interstate or intrastate transportation.

■ The first issue we shall address is whether the trial court erred in determining that the restrictive covenant was unenforceable for want of consideration. Defendants contend that the covenant not to compete was an afterthought; that the agreement had been reached before Bill broached the subject of including a noncompetition clause in the document. We note initially from our review of the record that Jim testified Bill had asked him if he had any objection to signing "a thing" that he wouldn't go into the trucking business, and that Bill testified that the discussion occurred at about the same time that they were discussing dissolving the partnership. We also note that both parties agreed upon the attorney that would draft their agreement and that the noncompetition clause appeared in the only draft of the dissolution agreement. Moreover, execution of the dissolution agreement was held at a formal closing at the bank where the cash was transferred and the deed to the real estate and assignment of titles to vehicles and the transport authorities were signed. The date of the closing, July 15, 1985, was set as the cutoff date for payment of partnership profits to Jim. Moreover, Bill entered into a loan agreement with the bank on this date to fund the partnership buy out. Where reduction of an agreement to writing and its formal execution are viewed by the parties as conditions precedent to vesting of rights and duties, there can be no contract until then, even if actual terms have been agreed upon. *Brunette v. Vulcan Materials Co.* (1970), 119 Ill. App. 2d 390, 395, 256 N.E.2d 44, 46.

■ Valuable consideration for a contract consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other. (*Anthony Co. v. Johnson* (1959), 20 Ill. App. 2d 128, 136, 155 N.E.2d 361, 365.) Adequacy of consideration for contract must be determined as of the time of entering the contract. (*O'Neill v. De Laney* (1980), 92 Ill. App. 3d 292, 297, 415 N.E.2d 1260, 1265.) Consideration for the sale of goodwill and the withdrawal from competition may be found in the general consideration for the sale of the business. 38 Am. Jur. 2d *Good Will* §12 (1968).

■ There can be no doubt that as of the date the contract was executed by the parties, the consideration was both existent and adequate to support this contract which included the covenant not to compete. Jim Russell received $550,000 cash, a $10,000 truck and the release of all partnership liabilities in exchange for the transfer

of Jim's 50% interest in the partnership assets and the covenant not to compete. Whether there is consideration for a contract is a question of law for the court. (*O'Neill v. De Laney*, 92 Ill. App. 3d at 297, 415 N.E.2d at 1265.) We find that the court erred in its legal determination that there was no consideration for the restrictive covenant because it found that the covenant was bargained for after the terms of the dissolution were reached. In reaching that determination it necessarily concluded that the agreement had been reached when Jim prepared the memorandum of the terms of sale. The proper time to measure consideration based on the parties' intent in this case should have been when the agreement was reduced to writing and executed by the parties on July 15, 1985.

■ As a second issue we will address whether the restrictive covenant was unenforceable because plaintiff had no investment in goodwill. The interest which the purchaser is entitled to protect by a restraint is the enjoyment and possession of the goodwill of the property transferred to him. (*O'Sullivan v. Conrad* (1976), 44 Ill. App. 3d 752, 756, 358 N.E.2d 926, 929.) Defendants argue that there was no such investment for the following reasons: (1) the word "goodwill" does not appear in either the dissolution agreement or related sale documents; (2) goodwill has never appeared as an asset on the partnership books of Frank Russell and Son Trucking Company; (3) Frank Russell and Son Trucking Company, as a trucking business, had no goodwill.

■ As to the first contention, the majority rule is that if a business is sold and transferred from one person to another, goodwill, though not specifically mentioned, is transferred as an incident to the business. (Annot., 65 A.L.R.2d 502, 503 (1959).) Only one Illinois case has recognized that rule; however, the court held therein that goodwill did not pass by implication under the specific facts of the case because the documents evidenced only a sale of the business property and not a sale of the business itself. (*United Romanian Meat Market & Grocery Store v. Abramson* (1920), 218 Ill. App. 577, 582.) Plaintiff has also directed our attention to several decisions from other jurisdictions upholding this majority rule. See *Wawak Co. v. Kaiser* (7th Cir. 1937), 90 F.2d 694, 698 (when property and business rights are sold, goodwill, though not specifically mentioned, passes to the vendee as an incident); *Baldwin v. Stuber* (1979), 182 Mont. 501, 518-19, 597 P.2d 1135, 1139 (if goodwill is not expressly reserved or excepted, it passes automatically to the purchaser of a business, regardless of whether the seller has or has not entered into an express covenant not to compete); *Montgomery v. Getty* (Mo. 1955), 284

S.W.2d 313, 318 (under contract for sale of interest in business containing seller's covenant not to compete in the business, buyers purchased not only the business assets but also the goodwill and seller's right of competition to the full extent of the territory named in the agreement); *Handyspot Co. v. Buegeleisen* (1954), 128 Cal. App. 2d 191, 194-95, 274 P.2d 938, 941 (sale of property and the business to which goodwill adheres transfers the goodwill to the vendee, although not specifically mentioned in the contract of sale).

In the instant case, Jim transferred to Bill "all of (his) right, title and interest as a partner in the partnership and all its assets, liabilities and rights to future profits as of July 15, 1985," by way of the dissolution agreement. The dissolution agreement also provided that Bill would have exclusive use of the partnership name, "Frank Russell and Son," a company which had been in existence since 1913. Moreover, Jim and Bill's partnership agreement mentions the goodwill of the business in connection with a partner's desire to effect a dissolution of the partnership. Defendants argue, however, that goodwill was not discussed by the brothers, was not mentioned on the written memorandum of the dissolution which Jim prepared and was not specifically transferred in the dissolution document or bill of sale, and so it could not have been part of their bargain. We note that exclusive use of the business name, disposition of the partnership note which was a liability of the business and preparation of the final tax returns, among other provisions, were also not listed on the memorandum Jim prepared, but there can be no doubt that these provisions were part of Jim and Bill's bargain as memorialized in the partnership dissolution agreement. Because we find that the entire business interest was transferred in this case, we hold that the goodwill of Frank Russell and Son Trucking passed by implication in the sale of Jim's partnership interest to Bill, adopting the aforementioned majority rule.

■ Defendants argue as their second and third contentions that goodwill cannot pass by implication where it has no value or the business itself has no goodwill, citing as authority *Behn v. Shapiro* (1955), 8 Ill. App. 2d 25, 130 N.E.2d 295. The extraordinary remedy of an injunction will not be entertained by equity unless substantial damage to a property right is clearly shown; therefore, goodwill must be shown to have a substantial value, an asset to the partnership, before it will be considered a property right requiring protection by injunctive relief. (*Behn v. Shapiro*, 8 Ill. App. 2d at 31, 130 N.E.2d at 299.) Goodwill in the legal sense has come to mean the advantages a business has over competitors as a result of its name, location and own-

er's reputation. (*Marathon Petroleum Co. v. Chronister Oil Co.* (C.D. Ill. 1988), 687 F. Supp. 437, 440.) Its value consists in the probability that the customers of the old firm will continue to be customers to the new. (*Marathon Petroleum*, 687 F. Supp. at 440.) Goodwill is an intangible asset and not all businesses possess goodwill. *Behn v. Shapiro*, 8 Ill. App. 2d at 31, 130 N.E.2d at 299.

In contrast with the instant case, plaintiff in *Behn v. Shapiro* argued that the inclusion of the word "goodwill" in the sale of the partnership interest barred the retiring partner from soliciting former customers of the partnership in a competing business, even though there was no restrictive covenant not to compete in the agreement. The court found that plaintiff had not met his burden of proving that goodwill was a valuable partnership asset of the produce business which was sold because there was insufficient proof concerning the extent to which the 60 customers from whom the defendant was sought to be enjoined from soliciting were actual and valuable customers of the firm. (*Behn v. Shapiro*, 8 Ill. App. 2d at 35-36, 130 N.E.2d at 301.) In *Marathon Petroleum*, a Federal court applying Illinois law refused to enforce a restrictive covenant ancillary to a sale of gasoline stations, because customer loyalty in the sale of gasoline today is primarily a function of price and convenience, and so plaintiff would suffer no more injury if a stranger began to compete in the manner the defendants had. (*Marathon Petroleum*, 687 F. Supp. at 441.) The court held that a noncompetition agreement ancillary to the sale of a business is appropriate only where competition by the former owner would impair the operation of the purchaser beyond that which would arise from the competition of an unrelated third party with similar marketing skills. *Marathon Petroleum*, 687 F. Supp. at 442.

■ We find from our review of the record that there was sufficient proof by plaintiff that goodwill was an asset of Frank Russell and Son Trucking, and one which had value. First, Frank Russell and Son Trucking was an established business in existence for nearly 75 years in West Frankfort, Illinois, and was a business which had not only been owned as a partnership by the parties for nearly eight years but also by their grandfather and father, respectively, before them. Jim admitted that his corporation was selling and delivering magnetite to many of the same mines to which Frank Russell and Son Trucking had previously been making magnetite deliveries. Bill testified that his profits had significantly declined since JRS began operating. We also note that it was Jim's familiarity with the delivery of the product and the purchasers for these mines which enabled him to break into the magnetite business. Jim's supplier, American Minerals,

had previously been unable to do so. We find it implausible that Jim Russell's family name had nothing to do with his relative ease in breaking into this market. Second, in a financial sense, goodwill value is based upon earning potentiality in excess of normal return on tangible assets and it means the existence of intangible values in the business, such as a trade name of good repute, location or uniqueness of product. (*Securities Realization Co. v. Peabody & Co.* (1939), 300 Ill. App. 156, 171, 20 N.E.2d 874, 881.) The attorney who drafted the dissolution agreement was also a certified public accountant, and he opined that the value of the partnership's intangibles, including goodwill, was represented as the value paid to Jim in excess of 50% of the agreed-upon value of the tangible partnership property. In his opinion the consideration for the intangibles was the amount of the partnership liabilities Bill assumed from Jim. Those liabilities included the $112,000 promissory note, the $176,722 present value of the annuity payments to Mrs. Russell, the accounts payable and payroll taxes through July 15, 1985. That goodwill was not carried as an account on the partnership books we find to be irrelevant because, as this witness testified, goodwill is not a depreciable asset. Therefore, we find that the trial court erred in concluding that the restrictive covenant was unenforceable because there was no proof that the partnership owned goodwill or that it had any value.

■ Next we will address the issue of whether the restrictive covenant was unenforceable because of lack of reasonableness. Covenants not to compete are carefully scrutinized by the court because of its abhorrence of restraint of trade. (*Boyar-Schultz Corp. v. Tomasek* (1981), 94 Ill. App. 3d 320, 323, 418 N.E.2d 911, 913.) The enforceability of a restraint ancillary to the sale of a business or property depends on the reasonableness of the restraint as to time and as to the extent of the territory, as judged by the circumstances of the particular case. (*McCook Window Co. v. Hardwood Door Corp.* (1964), 52 Ill. App. 2d 278, 286, 202 N.E.2d 36, 41.) The concept of reasonableness can be divided into three elements: the restraint as to time and as to territory must be necessary in its full extent for the protection of the purchaser, but must at the same time not be oppressive on the seller, and must not be injurious to the interests of the general public. *McCook*, 52 Ill. App. 2d at 287, 202 N.E.2d at 41.

■ As to the first element, in order that the restraint be reasonable for the purchaser, it must protect him in the enjoyment and possession of the goodwill of the property transferred to him, and can cover only that territory to which the goodwill extends. (*McCook*, 52 Ill. App. 2d at 287, 202 N.E.2d at 41.) In the *McCook* case the court

found that the covenant which provided for restraint of unlimited duration within 150 miles of the particular business location was unreasonable because there was no showing that plaintiff had customers as far away as 150 miles from its plant and the restraint was greater than necessary for the protection of plaintiff, the purchaser of the stock. (*McCook*, 52 Ill. App. 2d at 288-89, 202 N.E.2d at 42.) In contrast, plaintiff proved in the instant case that the covenant was reasonable as to time when he introduced evidence about the longstanding presence of his family's trucking business known as Frank Russell and Son Trucking in West Frankfort, Illinois. Moreover, the 100-mile radius was shown to be reasonable with Jim's admission that it delivered magnetite to the same mines as Frank Russell and Son Trucking and that these mines were all located within 100 miles of West Frankfort. We therefore find that the restraint was reasonable for Bill, the purchaser.

Second, we believe that the restraint was reasonable and not unduly harsh or oppressive to Jim, the seller. Restrictive covenants accompanying the purchase of assets are more favorably viewed than those connected with the employer-employee arrangements because of the arm's-length bargaining position of the parties. (*Marathon Petroleum*, 687 F. Supp. at 439.) Moreover, since the seller, in determining the sale price, usually includes therein the value of its goodwill, which value is enhanced by the agreement not to compete, the showing of hardship must be substantial. (*O'Sullivan v. Conrad* (1976), 44 Ill. App. 3d 752, 757, 358 N.E.2d 926, 930.) We have already found that the restrictive covenant was supported by consideration and that Frank Russell and Son Trucking possessed goodwill as a partnership asset and that this asset had value. Jim received cash in the amount of half the value of the tangible property, a truck, and release from two partnership liabilities. Defendants have also advanced no argument as to any special hardship to Jim in being held to his bargain and complying with the restrictive covenant, such as inability to earn a living, relocate, or use a special skill. See *O'Sullivan*, 44 Ill. App. 3d at 757, 358 N.E.2d at 930; *Bauer v. Sawyer* (1956), 8 Ill. 2d 351, 355, 134 N.E.2d 329, 331; *Boyar-Schultz*, 94 Ill. App. 3d at 323, 418 N.E.2d at 914.

Third, we believe that the restraint was reasonable to the general public. Whether the contract is reasonable or contrary to public policy is ultimately a question of law. (*Boyar-Schultz*, 94 Ill. App. 3d at 323, 418 N.E.2d at 914.) There was testimony that other contract and common carriers operate in the geographic area covered by the restrictive covenant and so compliance by Jim with the covenant

will not result in a monopoly by Bill or lack of competition in this trade area. We therefore find that the trial court erred as a matter of law when it found the restrictive covenant unreasonable and therefore unenforceable.

■■ ■ The final issue we will address is the court's finding that Jim's business was not a buy-sell sham to disguise operation in the trucking business. Plaintiff relies on the "primary business test," espoused in certain Interstate Commerce Commission (hereinafter ICC) cases to determine if private carriers were in actuality common or contract carriers requiring ICC permits, in order to reach the conclusion in this case that Jim Russell violated the restrictive covenant in their dissolution agreement. A private carrier is not subject to either Illinois or Interstate Commerce Commission regulation and is defined by Illinois statute to be "any person engaged in the transportation of property or passengers" "[w]here the transportation is incidental to and within the scope of the person's primary business purpose, and the primary business is other than transportation." (Ill. Rev. Stat. 1987, ch. 95½, pars. 18c—1104(27), 18c—4102(i).) Thus, as plaintiff noted in his opening statement, if JRS is found to be a private carrier rather than a common or contract carrier under this "primary business test," Jim is not engaged in the trucking business and has not violated the restrictive covenant.

Preliminarily we must decide whether the "primary business test" controls in construing "trucking business" for purposes of determining whether there was a breach of the covenant. We note that other courts have utilized the "primary business test" other than in the context of determining violations of the ICC regulation of common and contract carriers and for purposes of construing terminology in documents. For example, in *Gambino v. Jackson* (1965), 150 W. Va. 305, 145 S.E.2d 124, the court used the "primary business test" in an insurance policy declaratory judgment case to determine that the insured was a private carrier at the time of the accident such that the liability policy required in connection with the insured's transportation as a contract or common carrier was not in effect. (*Gambino*, 150 W. Va. at 314, 145 S.E.2d at 130.) See also *Boyes v. State of Arizona* (1968), 8 Ariz. App. 304, 445 P.2d 861 (because defendant was a private carrier under the "primary business test," he was not subject to highway tax pertaining to contract carriers); *Gensler v. Wisconsin Department of Revenue* (1975), 71 Wis. 2d 1108, 236 N.W.2d 648 (taxpayer found to be contract carrier rather than private carrier under "primary business test" could properly claim exemption from sales and use taxes).

Whether or not a contract term is ambiguous and in need of construction is a question of law for the court. (*Welt v. Koehring Co.* (N.D. Ill. 1979), 482 F. Supp. 437.) The construction of a written contract is a question of law for the court. (*Sturgeon v. Jacobs* (1951), 343 Ill. App. 460, 99 N.E.2d 635.) Where terms of agreement are open to more than one reasonable interpretation, evidence of extrinsic facts and circumstances is admissible to determine true intent of parties. *Maloney v. Maloney* (1980), 88 Ill. App. 3d 146, 148, 410 N.E.2d 416, 417.

Defendants argue that the the covenant does not restrict Jim Russell from "procuring and moving magnetite." Their argument is, in effect, that under the plain and unambiguous meaning of the term "trucking" there is no violation, because their business is sales. In support of this argument they note that JRS's customers are the mines to which it sells magnetite, while Frank Russell and Son Trucking's customer is Reiss-Viking, for which it ships magnetite to the mines. We find that to be a distinction of form over substance, especially in context of the "primary business test" for determining whether a business is a common or contract carrier. Moreover, in light of the extrinsic-evidence testimony of both parties with respect to their discussion about the restrictive covenant, it is clear that their concern was preventing Jim from competing with Bill. Plaintiff maintains that the incorporation of delivery along with sale of magnetite was in fact competition with his business. We therefore find that the term in the covenant was ambiguous such that extrinsic evidence was admissible to aid the court in determining whether Jim was "directly or indirectly in the trucking business." We further find that the "primary business test" is relevant and appropriately may be used to aid the court in its construction of the covenant, for reasons stated as follows.

██ The "primary business test" was first developed as interpretation of an Interstate Commerce Commission regulation in response to carriers who resorted to sham "buy-and-sell" arrangements in order to avoid regulation as a common carrier:

> " 'If the facts establish that the primary business of an operator is the supplying of transportation for compensation then the carrier's status is established though the operator may be the owner, at the time, of the goods transported and may be transporting them for the purpose of sale. ... If, on the other hand, the primary business of an operator is found to be manufacturing or some other noncarrier commercial enterprise, then it must be determined whether the motor operations are in bona

fide furtherance of the primary business or whether they are conducted as a related or secondary enterprise with the purpose of profiting from the transportation performed. In our opinion, they cannot be both.' " (*Red Ball Motor Freight v. Shannon* (1964), 377 U.S. 311, 315, 12 L. Ed. 2d 341, 344, 84 S. Ct. 1260, 1262-63, quoting *Lenoir Chair Co.*, 51 M.C.C. 65, 75, *aff'd sub nom. Brooks Transportation Co. v. United States* (E.D. Va. 1950), 93 F. Supp. 517, *aff'd* (1951), 340 U.S. 925, 95 L. Ed. 668, 71 S. Ct. 501.)

The "primary business test" was later codified in section 303(c) of the Interstate Commerce Act:

"[No] person engaged in any other business enterprise [shall] transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise (other than transportation) of such person." (49 U.S.C. §303(c) (1958).)

A typical buy-and-sell arrangement is one under which the carrier "buys" property at a shipping point, transports it to a delivery point and there "sells" it to the real purchaser, the "profit" to the carrier amounting to the price of the transportation between the two points. (*Red Ball*, 377 U.S. at 313-14, 12 L. Ed. 2d at 343, 84 S. Ct. at 1262.) Certain criteria characteristic of the spurious buy-and-sell device have been developed by the ICC. Among these are the large investment of assets or payroll in transportation operations; negotiating the sale of goods transported in advance of dispatching a truck to pick them up; direct delivery of the transported goods from the truck to the ultimate buyer, rather than from warehoused stocks; solicitation of the order by the supplier rather than the truck owner; and inclusion in the sales price of an amount to cover transportation costs. (*Red Ball*, 377 U.S. at 318-19, 12 L. Ed. 2d at 346-47, 84 S. Ct. at 1264-65.) The purpose of the ICC regulations is primarily to pierce the spurious veil of private carriage, when in fact the hauler should be required to be licensed by the ICC as a "for-hire" carrier. (*Gensler*, 71 Wis. 2d at 1118, 236 N.W.2d at 653.) The court in *Gensler* applied 12, more specific, criteria developed by the Federal courts in order to evaluate the "primary business test" on the basis of the particular facts of a particular operation, as required by the *Red Ball* decision. (*Gensler*, 71 Wis. 2d at 1119, 236 N.W.2d at 654.) Those criteria were:

"1. Whether the carrier is the owner of the property transported.

2. Whether orders for the property are received prior to its

purchase by the carrier.

3. Whether the carrier utilizes warehousing facilities and the extent of this use as a storage place.

4. Whether the carrier undertakes any financial risks in the transportation-connected enterprise.

5. Whether the carrier includes in the sale price an amount to cover transportation costs and its relation to the distance the goods are transported.

6. Whether the carrier transports or holds out to transport for anyone other than itself.

7. Whether the carrier advertises itself as being in a non-carrier business.

8. Whether its investment in transportation facilities and equipment is the principal part of its total business investment.

9. Whether the carrier performs any real service other than transportation from which it can profit.

10. Whether the respondent at any time engages for-hire carriers to effect delivery of the products, as might be expected, for example, when it is called upon to fill an order and its own equipment is otherwise engaged.

11. Whether the products are delivered directly from the shipper to the consignee (*i.e.*, without intermediate warehousing).

12. Whether solicitation of the order is by the supplier rather than the truck owner." (*Gensler*, 71 Wis. 2d at 1121-22, 236 N.W.2d at 654-55.)

Transportation must not only be in furtherance of a primary-business enterprise but also within the scope of that business and both tests must be satisfied. (*Church Point Wholesale Beverage Co. v. United States* (W.D. La. 1961), 200 F. Supp. 508, 516.) If transportation of property is performed for a profit and not merely as an incident to a principal commercial enterprise, then there is a contract-carrier business; merely combining a carrier operation with a noncarrier operation does not render the whole noncarrier. *Boyes v. Arizona* (1968), 8 Ariz. App. at 310, 445 P.2d at 867 (Molloy, J., dissenting).

Plaintiff in the instant case attempted to prove that the primary business of JRS was, in fact, that of transportation by showing that it would purchase, haul and resell American Minerals' magnetite at a price approximately equal to the cost of the product plus a transportation charge equal to the freight rate of other contract carriers. This was essentially the argument made by the Public Service Commission in *Thomas J. Peck & Sons v. Public Service Comm'n* (Utah

1985), 700 P.2d 1119. Jim testified, and JRS' invoices indicate, that the selling price of the magnetite to each mine varied in proportion to the distance from American Minerals' site in Rosiclare, Illinois. Further, plaintiff maintains that transportation of the magnetite was not within the scope of any primary business since JRS neither manufactures, grinds or in any way physically alters the product purchased from American Minerals. It purchases magnetite in bulk form or already bagged and ground to the specification ordered by the mine. It does not own any equipment for testing the specification of the product ordered by its customer and if an order is out of specification it is American Minerals which accepts the risk of loss when it replaces the rejected order for the customer. Other *Red Ball* criteria are present, plaintiff argues, because JRS's assets and payroll are largely geared to its transportation operation and it often engaged in direct delivery of orders to customers taken before a truck was dispatched to pick up the product. With respect to the *Gensler* criteria only items 6 and 7 appear not to have had any evidence put forward in the record. The only *Red Ball* criteria not directly present (which we note to be similar to item 12 of the *Gensler* criteria) had to do with the supplier rather than the truck owner taking the order. While the evidence appears to be that JRS took its own orders we note that it was provided with an office at the Rosiclare site and that American Minerals had been trying unsuccessfully to break into this business until the arrangement with Jim had been made.

We are unconvinced that the court evaluated the defendants' conduct under the "primary business test" criteria. We further believe that plaintiff established a *prima facie* case that defendant was in the trucking business under a majority of the "primary business test" criteria and so the trial court erred in entering judgment for the defendants at the close of plaintiff's case. Accordingly, the judgment of the Franklin County circuit court is reversed and the cause is remanded to the court below for a new trial before another judge.

Reversed and remanded.

GOLDENHERSH, J., concurs.

JUSTICE HARRISON, dissenting:
I must dissent.

Where a trial court has directed a verdict in a nonjury case, the trial court's decision will not be reversed unless it is contrary to the manifest weight of the evidence. (*Fields v. Sax* (1984), 123 Ill. App.

3d 460, 463, 462 N.E.2d 983, 986.) For a finding or judgment to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident. (*Dutton v. Roo-Mac, Inc.* (1981), 100 Ill. App. 3d 116, 122, 426 N.E.2d 604, 609.) Such is not the case here.

Covenants not to compete are to be strictly construed and interpreted and any doubts or ambiguities must be resolved in favor of the natural rights and against restriction. (*Hagerty, Lockenvitz, Ginskey & Associates v. Ginzkey* (1980), 85 Ill. App. 3d 640, 643-44, 406 N.E.2d 1145, 1147.) Moreover, it appears that the agreement in question, including the restrictive covenant, was prepared by Bill Russell, through his attorney, and the rule is that a written instrument is construed most strongly against the person who prepared it. *Crest Commercial, Inc. v. Union-Hall, Inc.* (1968), 104 Ill. App. 2d 110, 243 N.E.2d 652, 656.

The trial judge noted that the restrictive covenant "does not say that the seller will not engage in the business of procuring and moving magnetite." The covenant only refers to the seller agreeing "he will not engage in the business of trucking, hauling, general moving and storage" in the agreed area. It seems to me that this language is not in any way ambiguous; but even if it were, there is nothing in the record that indicates it meant anything other than Jim's not going into the trucking business. I take a view similar to the trial court that selling and delivering magnetite simply does not violate the covenant. Notwithstanding the strained reasoning of the majority, we are bound to strictly construe covenants not to compete and any ambiguities must be resolved in favor of natural rights and against restriction.

Therefore, I cannot say that the judgment of the trial court is manifestly against the weight of the evidence, and I would affirm the trial court's granting a directed verdict in favor of defendants Jim Russell, Donna Russell and Jim Russell Supply, Inc.